**2022 IL 126705**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 126705)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
SHANE LEWIS, Appellee.

*Opinion filed June 24, 2022.*


JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman and Overstreet concurred in the judgment and opinion.

Justice Michael J. Burke dissented, with opinion, joined by Justices Theis and Carter.


**OPINION**

¶ 1     Defendant Shane Lewis was charged with involuntary sexual servitude of a minor (720 ILCS 5/10-9(c)(2) (West 2014)), traveling to meet a minor (*id.* § 11-26(a)), and grooming (*id.* § 11-25(a)). At trial, defendant asserted the defense of

entrapment. A jury found defendant guilty of the offenses, and the circuit court of Kane County sentenced him to six years' imprisonment. On appeal, defendant argued that defense counsel was ineffective in presenting his entrapment defense where he failed to (1) object to the circuit court's responses to two jury notes regarding the legal definition of "predisposed," (2) object to the prosecutor's closing argument mischaracterizing the entrapment defense and the parties' relevant burdens of proof, and (3) present defendant's lack of a criminal record to the jury. The appellate court agreed and reversed defendant's conviction, holding that defense counsel's cumulative errors rendered the proceeding unreliable under *Strickland v. Washington*, 466 U.S. 668 (1984). 2020 IL App (2d) 170900, ¶ 59. The court remanded for a new trial, finding that the evidence was sufficient to retry defendant, for purposes of double jeopardy. *Id.* ¶ 60. For the following reasons, we affirm the judgment of the appellate court.

¶ 2                                    I. BACKGROUND

¶ 3        Defendant was charged by indictment with involuntary sexual servitude of a minor under section 10-9(c)(2) of the Criminal Code of 2012 (Code). 720 ILCS 5/10-9(c)(2) (West 2014). He was also charged with the felony offense of traveling to meet a minor under section 11-26(a) of the Code (*id.* § 11-26(a)) and grooming under section 11-25(a) of the Code (*id.* § 11-25(a)). The case proceeded to a jury trial on July 31, 2017.

¶ 4                                    A. Jury Trial

¶ 5        The trial commenced, during which the following evidence was presented to the jury. Geoffrey Howard, a special agent with the United States Department of Homeland Security (DHS), testified that he coordinated a sting operation with the Aurora Police Department and that the goal of the undercover operation was to arrest multiple people on the demand side of human trafficking. The operation involved posting an advertisement for an escort on Backpage.com. He described Backpage.com (Backpage) as a website that had advertisements for various goods and services and had an adult services section. The phone number in the ad did not link to an actual phone but rather went into a software system that allowed multiple officers to read and respond to text messages. The program created a record of all

the messages. According to Howard, as a matter of protocol, the officers were to stop talking or texting with a suspect if the suspect wanted to have sex with an adult. Before posting the ad, agents reserved adjoining rooms at a hotel in Aurora, and in the "target room" an undercover agent posed as a mother who was offering her 14- and 15-year-old daughters for sex. Two surveillance cameras were set up, one in the hallway and the other in the "target room."

¶ 6      Investigator Erik Swastek of the Aurora Police Department testified that he composed and posted the advertisement on January 8, 2015. He explained that to post a Backpage ad a person had to be 18 or older. The sting operation's ad indicated that the escort was 18 years old. Swastek testified that the officers were instructed to respond that they were the mother of two minor girls, both available for sex in exchange for money.

¶ 7      The advertisement was titled "young warm and ready:)." The body of the ad read:

> "Its ssooooooo cold outside, come warm up with a hot little co ed. Im young, eager to please and more than willing to meet all your desires. come keep me warm and I promise to return the favor:O):) ask about my two for one special
>
> text me at 630-five 2 four-four 8 four 8.
>
> 100 donation for hh
>
> 150 donation full hour
>
> Poster's age: 18"[1]

The ad included a photo of an adult female appearing in cut-off jeans and a midriff-baring top with her face cropped off. See Appendix I.

¶ 8      Agent Spencer Taub of DHS testified that he was the assigned texter who responded to defendant's texts beginning at 10:02 p.m. He pretended to be the

---

[1][*Sic*] throughout.

mother offering her underage daughters for sexual services. The following text message conversation[2] occurred:

"[DEFENDANT]: Hey looking to get warm

[TAUB]: hey—my girls could use some warming up 2 ;)

[DEFENDANT]: What's up with 2 girl. I only see pic of one?

[TAUB]: no can't post pix of my daughters, 2 risky

[DEFENDANT]: HaHa. Well what's the 2 girl special? And do u serve downers grove

[TAUB]: no we r in aurora. infall only

[DEFENDANT]: Well it's not to far from me but to come out in this weather I would have to know what they look like. U don't have to post a pic. U can text some

[TAUB]: 200 for 2 grls

[DEFENDANT]: That's fine but I need to know what they look like

[TAUB]: the 14 yrs is blond and 15 yrs is brunet—both r in sports

[DEFENDANT]: wtf?? Not interested in minors. You crazy?

[DEFENDANT]: I'm 32

[DEFENDANT]: 18 is good but nothing under that too risky!!

[TAUB]: as long as u r gentle and treat my girls good

[TAUB]: I'm here to protect my grls

[DEFENDANT]: Are you a female?

---

[2]Much of the evidence in this case is in the form of text messages. There are numerous grammatical, spelling and syntax errors in the messages. Because indicating each mistake with a [*sic*] would be distracting and correcting all the errors posed the risk of altering the meaning of the messages, we reproduce the messages in their original form.

[DEFENDANT]: Are u affiliated with the law or something?

[TAUB]: yes

[DEFENDANT]: Yes your with the law

[TAUB]: ummm.. no.. r u?

[DEFENDANT]: No.

[DEFENDANT]: Are u affiliated with the law. I want to make this question clear. Please answer in your next text

[DEFENDANT]: I am not!!

[DEFENDANT]: What if I just see u. Since your above 18

[TAUB]: no—wat r u talking about? r u a cop? Ur txt sounds like u r

[DEFENDANT]: No im not! But why wud u advertise their age when u know that's illegal under 18.

[TAUB]: I said yes to being a female—u txt way 2 fast

[DEFENDANT]: Haha sorry for fast text.

[TAUB]: because I don't want fricken cops at my f*** door

[DEFENDANT]: I think naturally they are old enough but the law says they are not.

[TAUB]: i do 2—my girls want 2 do this

[DEFENDANT]: Send me a pic

[TAUB]: i won't put them into sum thing they don't wann do

[DEFENDANT]: Ok where u at

[TAUB]: haha my txts are cumin in so f*** up

[TAUB]: im in aurora

[DEFENDANT]: Where you at. I'll come only if your there watching

[DEFENDANT]: I know aurora. Where at?

[TAUB]: yea—i'll watch—u b 2 ruf on my girls i'll kick ur a***.

[TAUB]: which one u want? 14 yr or 15, or both? Both is 200?

[DEFENDANT]: What about u how much for u

[TAUB]: not a ? both is 200

[DEFENDANT]: How much for all 3 of u

[TAUB]: I'm not in hun

[DEFENDANT]: U sure this is safe?

[DEFENDANT]: Ok tell me where to come

[TAUB]: what u want?

[DEFENDANT]: Both

[TAUB]: k 14 yr old is shy- so b gentl. No anal, must wear condom

[DEFENDANT]: No anal for sure and condom yes

[DEFENDANT]: If she doesn't want to she doesn't have to

[TAUB]: ok 88 and orchard

[DEFENDANT]: Hotel?

[TAUB]: i appreciate that. so just sex? if something else let me tell her

[TAUB]: yes hotel

[DEFENDANT]: On my way[.]''

The next text exchange began at 11:02 p.m.

"[DEFENDANT]: Ok I'm at exit.

- 6 -

> [TAUB]: ok-we r at holiday inn txt when u r in lot.
>
> [DEFENDANT]: K in lot.
>
> [TAUB]: k room 311
>
> [DEFENDANT]: K[.]"

This text occurred at 11:16 p.m.

¶ 9        In the video footage captured by the hallway surveillance camera, defendant exited the elevator. He then walked up and down the hallway for several minutes before knocking on the door of the "target room" at about 11:20 p.m.

¶ 10       Agent Melissa Siffermann of DHS was the undercover agent waiting in the "target room" to meet defendant. She posed as the mother of the two minor girls. When defendant arrived and knocked on the door, she invited him in. The audiovisual recording of their encounter was played for the jury, and a full transcript of their conversation was admitted into evidence. See Appendix II.

¶ 11       Siffermann testified that defendant was well dressed and very polite but seemed nervous. She indicated that defendant was hesitant and expressed his concern that this was some type of a "setup." She told defendant that she "likes to meet the guys first just to make sure that they're not *** crazy." In addition, she told defendant he "look[ed] like a nice guy" and "seem[ed] like a good guy." Siffermann also told defendant that, as their mother, she was "ok" with this, that she would "tell them it's fine," and that "they had a little bit of experience but obviously they're not like, they're not pros." Siffermann testified that defendant stated that, "once a girl has her period, she's ready for that kind of thing." According to Siffermann, defendant used the term "schizzed." The term means a person climaxes so intensely as to defecate on oneself. Defendant also described that the type of sex he would have with the girls as "porno sex."

¶ 12       Eventually, defendant put $200 on a nightstand. At that point, around 11:25 p.m., Siffermann proceeded to the bathroom. Seconds later, an arrest team entered and handcuffed defendant. He stated: "I told her I didn't want anything to do with younger, young, young, that's what I told her."

¶ 13        When defendant was searched following his arrest, agents recovered his cell phone, a box of condoms, and $400. Agents also found an iPad in defendant's car. Defendant was then transported to the police station, where he was interviewed by Aurora police officer Greg Christoffel. Defendant waived his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and stated that he was in town for work and was feeling lonely, so he responded to three or four Backpage ads. He told Christoffel that he received a text message from someone that he believed to be the mother of 14- and 15-year-old females that were available for sex. He said he thought it was a typo but continued to respond out of curiosity. Defendant testified that he had no intention of having sex with underage girls.

¶ 14        Defendant consented to a search of his cell phone and iPad. The cell phone search revealed that, shortly before responding to the ad at issue here, defendant sent text messages to three other phone numbers. No inappropriate pictures of minors, no Internet searches for child pornography, and no evidence that defendant had tried to solicit a minor for sex on any other occasion were found on defendant's electronic devices.

¶ 15        Defendant presented his entrapment defense and testified that, at the time of the offenses, he was 35 years old and lived in Pennsylvania, where he was the vice president of sales for a vacation rental company. On the date of the offenses, he was in town working at the company's Downers Grove office and was staying at a hotel in Naperville. After finishing work that evening, defendant returned to the parking lot of his hotel and remained in his car. He was lonely and depressed because he and his wife had been separated for the past six months and he had spent the holidays alone. He began to search the Backpage website on his phone, which he had learned about from a fellow business traveler.

¶ 16        Defendant went to Backpage's "adult services" section, checked a box acknowledging that the section was for adults only, and then clicked on a link that said "adult escort." Defendant sent text messages in response to four ads and waited for a reply. He assumed that the ads involved adults because they were posted in the adults only section and listed the poster's age as 18. He testified that, when he responded to the ads, he was looking for companionship. He was not seeking a minor and did not know that any of the ads involved minors.

¶ 17    Defendant stated that, after exchanging a few texts with Taub, it became apparent to him that there was a sexual agenda. According to defendant, when Taub mentioned her underage daughters, he replied, and the transcript indicates that he sent four text messages in response to questions about his interest in minors: (1) "not interested in minors. You crazy?" (2) "18 is good but nothing under that too risky"; (3) "What if I just see u. Since your above 18"; and (4) "What about u how much for u." Defendant stated that he did not believe that it is okay to have sex with girls that age. He tried to redirect the conversation and reiterated his interest in having sex with her, as she was an adult.

¶ 18    He testified that both Taub and Siffermann, while portraying the fictional mother, made him "feel somewhat comfortable" with the idea of paying for sex with the underage girls. The text transcript reveals the following statements were made by Taub: that "as long as u r gentle and treat my girls good," "I'm here to protect my girls," "my girls want 2 do this," "they have a little bit of experience but obviously they're not like, they're not pros."

¶ 19    Defendant testified that he had never had any desire as an adult to have sex with a minor and that he agreed to do so only because the agents "put an idea in [his] head that was never there before." He stated that his memory was somewhat "foggy" about the night. Defendant also explained that, whenever he expressed reluctance or doubt, the agents diverted the conversation and complimented him. When asked about his comment that he "think[s] naturally [14- and 15-year-old girls] are old enough but the law says they are not," he testified that he meant girls that age are "capable" of having sex because he went to school with girls who were pregnant at that age. Defendant stated that, when he told Siffermann and Christoffel that he came to the hotel because he was curious, he meant "curious about what's going on," not curious about what it would be like to have sex with two underage girls. He also denied using the term "schizzed."

¶ 20    Defendant called four character witnesses. His sister, Krista Jackson, testified that she had never seen any inclination that defendant was interested in or predisposed to having sex with underage girls. Defendant's 23-year-old niece, Tanisha Lewis, testified that she had lived with defendant for a while, that he had never expressed any interest in having sex with underage girls, and that he had no predisposition to do so. Kevin Carlson, a longtime friend and coworker, was with

defendant on the business trip. He testified that defendant had never talked about underage girls or behaved in a manner that would indicate a predisposition for or interest in having sex with underage girls. Another longtime friend and coworker, Adam Kaper, who had attended charity events and vacationed with defendant, testified that defendant had "never shown any want to be with an underage person."

¶ 21                                B. Entrapment Instruction

¶ 22    Over the State's objection, the circuit court granted defendant's motion to instruct the jury on the defense of entrapment. The court instructed the jury as follows with defendant's Illinois Pattern Jury Instruction, Criminal, No. 24-25.04 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 24-25.04):

"It is a defense to the charge made against the defendant that he was entrapped, that is, that for the purpose of obtaining evidence against the defendant, he was incited or induced by a public officer to commit an offense.

However, the defendant was not entrapped if he was predisposed to commit the offense and a public officer merely afforded to the defendant the opportunity or facility for committing an offense."

¶ 23                          C. Jury Notes During Deliberations

¶ 24    During deliberations, the jury submitted three notes to the court. The first two notes were received at 12:37 p.m. The first note read: "Legal definition of incited and induced and predisposed." The second note concerned a request for certain transcripts and is not at issue on appeal.

¶ 25    Addressing the first note, the prosecutor stated that she had recently read a decision (which she did not identify) that held that a defense attorney was not ineffective for agreeing not to provide further instructions to the jury in response to a similar question because the words at issue have common terms. The court noted that the IPI Criminal 4th No. 24-25.04 instructions do not define the terms and that it was not inclined to provide the jury with dictionary definitions. Defense counsel voiced no objection and did not submit a definition of any of the terms. The parties agreed with the court's proposal to respond: "You have your instructions. Please

continue to deliberate." The court handwrote the response on the note and returned it to the jury.

¶ 26 At 1:05 p.m., the court received a third note from the jury, which stated: "predisposition—what does this mean—please give defini[tion]." Again, defense counsel did not object and did not propose that the court further clarify the term "predisposition." The court responded by writing on the note: "You have all of the instructions, please continue to deliberate." The court then went into recess until the jury reached a verdict. The jury found defendant guilty of all three offenses.

¶ 27 D. Posttrial Proceedings

¶ 28 Defendant filed a motion for a new trial, claiming *inter alia* that the State did not prove beyond a reasonable doubt that he was not entrapped. The court denied the motion.

¶ 29 Following a sentencing hearing, the circuit court sentenced defendant to six years' imprisonment on his conviction of involuntary sexual servitude of a minor and to two years on his conviction of traveling to meet a minor, to run concurrently. The grooming conviction merged into the conviction of traveling to meet a minor.

¶ 30 E. Appellate Court's Decision

¶ 31 On appeal from his convictions, defendant argued, *inter alia*, that defense counsel was ineffective for failing to (1) object to the circuit court's responses to two jury notes regarding the legal definition of "predisposed," (2) object to the prosecutor's closing argument mischaracterizing the entrapment defense and the parties' relevant burdens of proof, and (3) present defendant's lack of a criminal record to the jury. The appellate court agreed. 2020 IL App (2d) 170900, ¶ 59.

¶ 32 The appellate court determined that "predisposition," as understood in the entrapment context, focuses on the defendant's *mens rea* before the exposure to government agents: " ' "[P]redisposition is established by proof that the defendant was ready and willing to commit the crime without persuasion and before his or her initial exposure to government agents.' ' " *Id.* ¶ 37 (quoting *People v. Bonner*, 385

Ill. App. 3d 141, 146 (2008), quoting *People v. Criss*, 307 Ill. App. 3d 888, 897 (1999)).

¶ 33        The court reasoned that, to ensure that the jury properly understood the concept of predisposition despite having twice expressed confusion about it, the circuit court should have answered the jury's question with reference to the readily available explanation of predisposition set forth in *Bonner*. *Id.* ¶ 39 (citing *Bonner*, 385 Ill. App. 3d at 146). Defense counsel's acquiescence and his failure to provide the *Bonner* definition to the court was an error that constituted deficient performance. *Id.* The court reasoned that there was no strategic justification for allowing a confused jury to potentially stray from the proper time frame. *Id.* ¶ 40.

¶ 34        In addition, relying on *People v. Ramirez*, 2012 IL App (1st) 093504, ¶ 43, the court reasoned that defendant's lack of a criminal record was strong evidence demonstrating his lack of predisposition. 2020 IL App (2d) 170900, ¶ 43. The court also held that counsel's failure to present exculpatory evidence (lack of a criminal record) was an obvious error and failure to function as defense counsel guaranteed by the sixth amendment. *Id.* ¶ 44.

¶ 35        The court observed that, during closing argument, the prosecutor told the jury that, " '[i]f you find that the police did incite or induce him, then you can look at the next step,' " which was predisposition. *Id.* ¶ 46. The court found that the State was attempting to shift its burden of proof to defendant. *Id.* ¶ 47. The jury did not have to "find inducement" for defendant's entrapment defense to prevail; rather, the State's evidence had to disprove that defendant was entrapped beyond a reasonable doubt. *Id.*

¶ 36        Also, during the closing argument regarding predisposition, the prosecutor stated that " 'what we have to prove is that [defendant] was willing to do this and the opportunity was there.' " *Id.* ¶ 48. The court explained that the State was required to prove beyond a reasonable doubt that defendant was willing to commit the crime without persuasion and before his initial exposure to government agents. *Id.* The court determined that defense counsel should have objected to any argument that failed to pinpoint the proper time frame for the predisposition analysis. *Id.*

¶ 37        The court recognized that the effect of the State's burden-shifting inducement argument and the jury's confusion over predisposition was further compounded by

defense counsel's failure to inform the jury that defendant had no criminal history. *Id.* ¶ 58. Additionally, during closing argument, the State told the jurors that the instructions contained " 'a lot of legal words *** that [p]robably a good contract attorney *** might be able to figure out what they all are.' " *Id.* ¶ 59. The court found this characterization of the instructions "unfortunate" in that it suggested to the jurors that the salient terms might be beyond their understanding. *Id.* The court held that the cumulative effect of counsel's errors constituted deficient performance and rendered the proceeding unreliable under *Strickland*, 466 U.S. 668. 2020 IL App (2d) 170900, ¶ 59.

¶ 38    The court reversed defendant's convictions and remanded the matter to the circuit court for a new trial. *Id.* The court assessed the sufficiency of the evidence to determine whether it sufficed for double jeopardy purposes, and after reviewing the record in the light most favorable to the State, it concluded that the evidence was sufficient to support the jury's verdicts beyond a reasonable doubt. *Id.* ¶ 60. We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2020).

¶ 39                                II. ANALYSIS

¶ 40                   A. Ineffective Assistance of Defense Counsel

¶ 41    The State argues that the appellate court erred in granting relief on defendant's ineffective assistance of counsel claim. Specifically, the State maintains that defense counsel competently presented defendant's entrapment defense and, therefore, could reasonably acquiesce to the circuit court's responses to the jury questions regarding the legal definition of predisposed. The State also maintains that defense counsel reasonably did not object to the prosecutor's closing argument because counsel could be confident that the court would correctly instruct the jury following closing arguments. In addition, the State argues that defense counsel reasonably believed it was not necessary to introduce evidence of defendant's lack of a criminal history because he did elicit testimony that defendant had never been involved in sex with minors and presented four character witnesses on defendant's behalf. Alternatively, the State contends that, based on the strength of its case, defendant suffered no prejudice because there is no reasonable probability that

defense counsel's alleged errors affected the jury's assessment of inducement and predisposition.

¶ 42    Defendant responds that defense counsel's cumulative errors support his claim of ineffective assistance of counsel. Defendant points out that the appellate court properly found that he was prejudiced by defense counsel's errors in presenting his entrapment defense. Defendant requests cross-relief, arguing (1) that the State failed to prove beyond a reasonable doubt that he was not entrapped into committing the offenses, (2) that he was not guilty of involuntary sexual servitude of a minor where that statute applies to sex traffickers, not to patrons, and (3) his conviction and sentence for involuntary sexual servitude of a minor should be vacated because the statute violated the proportionate penalties clause of the Illinois Constitution.

¶ 43                        1. The *Strickland* Standard

¶ 44    The United States and Illinois Constitutions guarantee criminal defendants the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland*, 466 U.S. at 685-86; *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). Claims that counsel provided ineffective assistance are evaluated under the familiar two-pronged standard set forth in *Strickland*, 466 U.S. at 687-88. To prevail on an ineffective assistance of counsel claim, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance resulted in prejudice. *Id.* at 687. Under the first prong, defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Id.* at 689. *Strickland* instructs that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690.

¶ 45                        2. *Strickland* Prejudice

¶ 46    "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted

differently." *People v. Johnson*, 2021 IL 126291, ¶ 54 (quoting *Harrington v. Richter*, 562 U.S. 86, 111 (2011)). Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. *Strickland*, 466 U.S. at 696. A defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 693. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694. *Strickland* requires a defendant to "affirmatively prove" that prejudice resulted from counsel's errors. *Id.* at 693.

¶ 47                              3. Standard of Review

¶ 48        The performance and prejudice components of an ineffective assistance inquiry present mixed questions of law and fact. However, our standard of review for determining whether a defendant's sixth amendment right to the effective assistance of counsel was denied is ultimately *de novo*. *Johnson*, 2021 IL 126291, ¶ 52 (citing *People v. Hale*, 2013 IL 113140, ¶ 15).

¶ 49                          4. Relevant Statutory Provisions

¶ 50                                (a) Trafficking

¶ 51        Section 10-9(c)(2) of the Code provides:

> "A person commits involuntary sexual servitude of a minor when he or she knowingly recruits, entices, harbors, transports, provides, or obtains by any means, or attempts to recruit, entice, harbor, provide, or obtain by any means, another person under 18 years of age, knowing that the minor will engage in commercial sexual activity, a sexually-explicit performance, or the production of pornography, or causes or attempts to cause a minor to engage in one or more of those activities and:
>
> ***
>
> (2) there is no overt force or threat and the minor is under the age of 17 years[.]" 720 ILCS 5/10-9(c)(2).

¶ 52                                        (b) Entrapment

¶ 53        Section 7-12 of the Code provides:

> "A person is not guilty of an offense if his or her conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of that person. However, this Section is inapplicable if the person was pre-disposed to commit the offense *and* the public officer or employee, or agent of either, merely affords to that person the opportunity or facility for committing an offense." (Emphasis added). *Id.* § 7-12.

¶ 54                         B. Defense Counsel's Ineffectiveness

¶ 55        We now turn to the State's contention that defense counsel was effective where he (1) did not offer a definition of "predisposed" in response to the jury's first and third notes asking for a legal definition, (2) did not object to the prosecutor's closing argument explaining the relationship between the inducement and predisposition elements, and (3) did not present evidence of defendant's lack of a criminal record to the jury. We disagree.

¶ 56                      1. Defense Counsel Erred When He Failed to Insist
That the Court Provide the Legal Definition of
Material Terms in the Entrapment Instruction in
Response to the Jury's Questions

¶ 57        The State contends that defense counsel reasonably did not offer a definition of "predisposed" in response to the jury's requests for clarification. The State maintains that counsel could have concluded that considering the time frame between defendant's initial exposure to the government agents and his commission of the crimes, advising the jury of the temporal focus of predisposition was unnecessary. The State further contends that a definition was unwarranted because the pattern jury instructions did not include a definition of "predisposed," where it has a commonly understood meaning.

¶ 58    Generally, jurors are entitled to have their questions answered. *People v. Childs*, 159 Ill. 2d 217, 228 (1994); *People v. Reid*, 136 Ill. 2d 27, 39 (1990). When the jury asks a question on a point of law, when the original instructions are incomplete, or when the jurors are manifestly confused, the court has a duty to answer the question and clarify the issue in the minds of the jurors. *Childs*, 159 Ill. 2d at 229; *Reid*, 136 Ill. 2d at 39. Further, under certain circumstances, a circuit court has the duty to answer a jury's question even if the jury received proper instructions. *Reid*, 136 Ill. 2d at 39 (citing *People v. Flynn*, 172 Ill. App. 3d 318, 323 (1988)). When a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy. *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946); *People v. Caballero*, 102 Ill. 2d 23, 42 (1984). The failure to answer or the giving of a response that provides no answer to the question of law posed has been held to be prejudicial error. *Childs*, 159 Ill. 2d at 229; *People v. Shannon*, 206 Ill. App. 3d 310, 317 (1990) (finding circuit court's abuse of discretion by choosing not to respond to jury's confusion regarding the charges against defendant arising from the facts); *People v. Bryant*, 176 Ill. App. 3d 809, 812-13 (1988) (trial court erred by failing to properly exercise its discretion when it refused a jury request for a copy of the trial transcript); *Flynn*, 172 Ill. App. 3d at 324 (holding that, where the jury expressed confusion on points of law and the court did not clarify the questions in the minds of the jurors, the court's action prejudiced and deprived the defendant of a fair trial and was reversible error); *People v. Brouder*, 168 Ill. App. 3d 938, 946-48 (1988) (same).

¶ 59    We observe that in *People v. Landwer*, 279 Ill. App. 3d 306, 315-16 (1996), an entrapment case, the jury requested the definition of the word "originated." The court noted that the word "originated" appeared in the pattern instruction that was given to the jury and in the statute defining the entrapment defense. The appellate court observed that courts have previously held that a jury's request for a definition of a word contained in a jury instruction is a question of law. *Id.* at 316 (citing *People v. Kamide*, 254 Ill. App. 3d 67, 72 (1993), and *People v. Lovelace*, 251 Ill. App. 3d 607, 619 (1993)). The court recognized that, although the legal definition and the common meaning of "originated" are the same, this did not transform the question into one of fact. *Id.* at 315. The court explained that, while the meaning of the word "originated" may seem obvious to us, the record clearly indicates that the jurors were, indeed, confused. *Id.* The court held that the trial court's error was not harmless. *Id.* at 317.

¶ 60 Similarly, in the case under review, during its deliberations, the jury sent its first written question to the court that read, "Legal definition of incited and induced and predisposed." The court noted that the IPI Criminal 4th No. 24-25.04 instructions did not define the terms, and it declined to provide the jury with dictionary definitions. Defense counsel did not tender a definition of the terms or object. In fact, defense counsel acquiesced to the court's response: "You have all of your instructions, please continue to deliberate." Just under 30 minutes later, the jury, in a third written question, again asked, "Predisposition—what does this mean—please give definition." Again, defense counsel did not object or tender the "legal definition" of predisposition as set forth in *Bonner*. According to *Bonner*, predisposition means whether the defendant was willing to commit the crime before the defendant's initial exposure to government persuasion. *Bonner*, 385 Ill. App. 3d at 146. The court repeated its response that "[y]ou have all of the instructions, please continue to deliberate."

¶ 61 The State contends that defense counsel's acquiescence to the circuit court's responses was objectively reasonable considering the decision in *People v. Sanchez*, 388 Ill. App. 3d 467 (2009). In *Sanchez*, the appellate court determined that, when words in a jury instruction have a commonly understood meaning, the court need not define them with additional instructions, especially where the pattern jury instructions do not state that an additional definition is necessary. *Id.* at 477-78. The *Sanchez* jury asked for the definitions of "predisposed," "incite," and "induce," and the appellate court found that counsel was effective for agreeing to the court's response that the jury had been given all the instructions and to continue deliberating. *Id.* The court also found that the definitions were unnecessary because defendant's entrapment defense lacked merit. *Id.* at 475. We find the State's reliance on *Sanchez* is misplaced.

¶ 62 In *Sanchez*, the defendant was charged with possession of a controlled substance with intent to deliver. *Id.* at 474. The defendant raised the defense of entrapment. *Id.* However, the State rebutted the entrapment defense with the admissions the defendant made in his written confession, with his testimony at trial, and with the affidavit attached to his pretrial motion, which showed the defendant was willing and able to commit the offense without persuasion before his initial exposure to government agents. *Id.* After addressing the evidence of the defendant's predisposition, the court determined that the evidence was not close and that his

entrapment defense was without merit. *Id.* at 475. The *Sanchez* court resolved the ineffective assistance claim based on the facts in that case, which established that the defendant had a predisposition to sell drugs without government persuasion. *Id.* We agree with the appellate court's reasoning that *Sanchez* did not address the distinction between the common understanding of predisposed and its narrower meaning in criminal entrapment cases, which require the jury to consider the temporal issues associated with predisposition: the conduct of the defendant prior to making contact with the government agents. 2020 IL App (2d) 170900, ¶ 39. Because the defendant here had a viable entrapment defense since he had no criminal history and no predisposition to commit the offenses, we find the facts are different and *Sanchez* should not be followed.

¶ 63        In addition, it should be noted that the jury made a request for the definition of "incited" and "induced." It should be further noted that both terms appear in section 7-12 of the Code (720 ILCS 5/7-12 (West 2014)) and in the entrapment instruction (IPI Criminal 4th No. 24-25.04). By requesting a "legal definition," the jury was making it explicitly clear that it was having difficulty understanding the material terms in the instruction. See *Bollenbach*, 326 U.S. at 612-13. The terms must be understood in order for the jury to determine whether the government entrapped a defendant. Once defendant testified and presented his entrapment defense and the jury was given the IPI Criminal 4th No. 24-25.04, the jury, in order to find the defendant guilty beyond a reasonable doubt, was required to determine (1) whether the State "incited" or "induced" defendant to commit the offenses and (2) whether defendant was "predisposed" to commit the offenses and the government merely afforded him the opportunity to commit the offenses.

¶ 64        The term "predisposed" focuses upon whether the defendant was an "unwary innocent" or instead an "unwary criminal" who readily availed himself of the opportunity to perpetrate the offense. *Mathews v. United States*, 485 U.S. 58, 63 (1988) (citing *United States v. Russell*, 411 U.S. 423, 433, 436 (1973); *Sherman v. United States*, 356 U.S. 369, 372 (1958)). Predisposition is measured prior to the government's attempts to persuade the defendant to commit the crime. *Jacobson v. United States*, 503 U.S. 540, 553 (1992); *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir. 1983) (finding that predisposition is, by definition, the defendant's state of mind and inclination before exposure to government action). Therefore, the determination of predisposition is based on whether defendant was ready and

- 19 -

willing to commit the crime without persuasion and before his initial exposure to government agents. *Bonner*, 385 Ill. App. 3d at 146; *Criss*, 307 Ill. App. 3d at 897.

¶ 65 Thus, the relevant time frame for assessing a defendant's predisposition comes before he has had any contact with government agents and focuses on the evidence of defendant's conduct and state of mind prior to his contact with the officers. *Jacobson*, 503 U.S. at 553; *United States v. Poehlman*, 217 F.3d 692, 703 (9th Cir. 2000). While conduct and statements made by a defendant after contact by government agents may be relevant in determining defendant's predisposition, the critical temporal focus is defendant's conduct and state of mind prior to government contact. *Jacobson*, 503 U.S. at 553; *Kaminski*, 703 F.2d at 1008; *Poehlman*, 217 F.3d at 704-05 (finding that only those statements that indicate a state of mind untainted by the government's inducement are relevant to show predisposition); *Bonner*, 385 Ill. App. 3d at 146.

¶ 66 In the case at bar, the relevant temporal time frame involves defendant's conduct and statements prior to texting or making contact with the government agents. Thus, in order to determine whether defendant was predisposed to commit the crimes, the jury should have focused on evidence of defendant's conduct and state of mind prior to responding to the government's ad soliciting dates for an 18-year-old woman. While defendant presented evidence that, prior to exchanging text messages with the government, (1) he had no images of minors on his cell phone, (2) he had no images of minors on his computer, and (3) four character witnesses testified he exhibited no interest in having sex with minors, his attorney failed to present evidence that he had no criminal record.

¶ 67 Although the term "predisposed" has a common meaning, the record clearly establishes that there were two jury questions that requested a definition for predisposed. Two jury questions within a span of 28 minutes indicate that the jurors were confused and should have been provided with a "legal definition." See *Childs*, 159 Ill. 2d at 229; *Landwer*, 279 Ill. App. 3d at 315; *Kamide*, 254 Ill. App. 3d at 72; *Brouder*, 168 Ill. App. 3d at 946-48 (when a jury manifests confusion or doubt, it is the trial court's duty to reinstruct on any question of law giving rise to that doubt or confusion). Finally, two jury questions requesting a definition for three material words in the entrapment instruction make it explicit that the jury was having difficulty with the two questions that were presented in the instruction: (1) did the

government incite or induce defendant, and (2) was defendant predisposed to commit the offense before being subjected to the government agent's influence?

¶ 68        Additionally, the prosecutor stated in closing that the entrapment instruction contained "legal words" that only a good contract attorney would understand. This remark added to the jury's confusion leading to their questions for "legal definitions." See *People v. Lowry*, 354 Ill. App. 3d 760, 768 (2004) (citing *Childs*, 159 Ill. 2d at 228-29 (holding that failing to respond to a question asked by a jury, or responding in a way that fails to answer the question, may be as prejudicial as a response that is inaccurate, misleading, or likely to direct a verdict one way or another)); see also *People v. Coots*, 2012 IL App (2d) 100592, ¶ 45 (holding that reversible error can occur when the jury asks the court to define a key term used in the instructions and the court refuses the request).

¶ 69        As the appellate court observed, there is no strategic basis for allowing a confused jury to potentially stray from the proper time frame—the time before defendant's exposure to government agents' persuasion—in deciding whether defendant was predisposed to commit the offenses he otherwise admitted committing. 2020 IL App (2d) 170900, ¶ 40. Additionally, we find that there can be no trial strategy in allowing legal terms to go undefined when a jury is confused and shows a lack of understanding of the legal terms in the entrapment instruction that must be analyzed to determine whether the State met its burden of establishing that defendant was not entrapped. See *Lowry*, 354 Ill. App. 3d at 766 (finding that counsel's agreeing that no additional instruction was needed in response to a confused jury's question, because the term has a plain meaning within the jury's common knowledge, cannot be excused as mere trial strategy).

¶ 70        The jury's two notes, sent in quick succession, established that it was confused and in need of the court's guidance. Counsel erred when he failed to ask the court to define the legal terms in the jury's questions to alleviate their confusion, and counsel's error resulted in the jury being improperly instructed on how to apply the legal terms to the facts and prevented them from analyzing the evidence to determine defendant's guilt.

¶ 71        We find that the court's responses to the jury's questions were prejudicial error and an abuse of the court's discretion. See *Childs*, 159 Ill. 2d at 229 (finding that the giving of a response that provides no answer to the question of law posed has

- 21 -

been held to be prejudicial error); *Reid*, 136 Ill. 2d at 39 (finding that under certain circumstances, a court has the duty to answer a jury's questions). Accordingly, defense counsel's acquiescence and failure to challenge the court's answers to the jury's questions was one of multiple errors that substantiates defendant's ineffective assistance of counsel claim.

¶ 72

### 2. Defense Counsel Erred When He Failed to Object to the State's Closing Argument That Misstated the Issues to Be Analyzed by a Jury in an Entrapment Case

¶ 73      The State contends that defense counsel reasonably did not object to the prosecutor's closing argument concerning the relationship between the inducement and the predisposition elements of an entrapment defense. In the State's view, to the extent that the comments could be interpreted as implying that defendant had to prove that he was induced, rather than requiring the State to prove defendant was not induced, defense counsel could be confident that the court would correctly instruct the jury following closing arguments. In addition, the State maintains that its closing argument reflected that an entrapment defense consists of two separate elements: (1) government incitement and (2) defendant's lack of predisposition to commit the crime. According to the State, it may rebut the entrapment defense by proving either (1) that defendant was not induced to commit the offense or (2) that he was predisposed to do so. However, once defendant sufficiently raises an entrapment defense, the entrapment statute requires the State to prove (1) defendant was predisposed and (2) the government agents merely afforded him the opportunity or facility for committing the offenses. 720 ILCS 5/7-12 (West 2014).

¶ 74      The State relies on *United States v. Mayfield*, 771 F.3d 417, 434-35 (7th Cir. 2014), to support its contention that courts that have interpreted the similar entrapment defense under federal law have held that inducement means government solicitation of the crime plus some other government conduct. This creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts. The State contends that the *Mayfield* court correctly found that the government can defeat an entrapment defense by proving that the defendant was predisposed to commit the crime or that

- 22 -

there was no government inducement. See *id.* at 440. We find that the State's reliance on *Mayfield* is misplaced.

¶ 75     First, we observe that, as a general principle, decisions of the United States district courts and the circuit courts of appeals are not binding upon state courts. *People v. Fields*, 135 Ill. 2d 18, 72 (1990). Second, we observe that the *Mayfield* decision was not addressing the government's burden after it had shifted to them at trial but was addressing whether the defendant had met his burden by presenting evidence of entrapment thereby entitling him to a jury instruction on entrapment. *Id.* at 420.

¶ 76     The United States Supreme Court announced the majority view that a valid entrapment defense has two related elements: (1) government inducement of the crime and (2) a lack of predisposition on the part of the defendant to engage in the criminal conduct. *Mathews*, 485 U.S. at 63 (citing *Russell*, 411 U.S. at 435-36, and *Sorrells v. United States*, 287 U.S. 435 (1932)). Although the defense has two key elements—government inducement and lack of predisposition—the elements are conceptually related. *Id.*; *Sherman*, 356 U.S. at 372-73. The two elements of the entrapment defense are related in that inducement is evidence bearing on predisposition: the greater the inducement, the weaker the inference that the defendant was predisposed to commit the crime. *Russell*, 411 U.S. at 430-32.

¶ 77     Illinois holds the same view that a valid entrapment defense consists of government incitement of the crime and a lack of predisposition on the part of the defendant. *People v. Placek*, 184 Ill. 2d 370, 380-81 (1998); *People v. Cross*, 77 Ill. 2d 396, 405 (1979). In addition, section 7-12 of the Code provides that entrapment "is inapplicable if the person was predisposed to commit the offense *and* the [government agent] merely affords to that person the opportunity or facility for committing an offense." (Emphasis added.) 720 ILCS 5/7-12 (West 2014). Thus, the State was required to rebut defendant's entrapment defense by presenting evidence that (1) defendant was predisposed to commit the offenses and (2) the government agents merely afforded to him the opportunity or facility for committing the offenses. See *id.*

¶ 78     We find that the prosecutor's closing argument was misleading and the jury was confused, as evidenced by its three questions. The prosecutor stated that, "if you find that the police did incite or induce [defendant], then you can look at the next

step," indicating predisposition. Here, the court found that defendant had presented sufficient evidence of the government's incitement and inducement to give the entrapment instruction, which shifted the burden to the State to rebut the entrapment defense with evidence that (1) defendant was predisposed to commit the offenses and (2) the government agents merely afforded to him the opportunity or facility for committing the offenses. See *id.* When addressing whether defendant was predisposed, one of the factors to be considered includes the type and nature of the inducement, as well as the manner in which it was applied. *Ramirez*, 2012 IL App (1st) 093504, ¶ 38. Once defendant presented his entrapment defense, the State had to prove (1) defendant's predisposition to commit the offenses and (2) the government agents merely afforded to him the opportunity or facility for committing the offenses. See *Mathews*, 485 U.S. at 62-63 (holding that a valid entrapment defense has two related elements: government inducement and a lack of predisposition on the part of the defendant to engage in the criminal conduct (citing *Sorrells*, 287 U.S. 435)).

¶ 79 In addition, the prosecutor stated in closing that "what we have to prove is that defendant was willing to do this, and the opportunity was there." This misstatement of the predisposition element omitted reference to the temporal focus of the analysis and created the danger that the jury would not be directed to the critical time frame: defendant's conduct during the period prior to the government's posting the ad and exchanging text messages to persuade defendant to commit the crimes. Consequently, by failing to object to the State's closing argument, defense counsel permitted the State to mislead the jury about what it had to prove to establish defendant's guilt beyond a reasonable doubt. Accordingly, defense counsel's second error prejudiced defendant and further substantiates his claim of ineffective assistance of counsel.

¶ 80 3. Defense Counsel Erred When He Failed to
Present Evidence That Defendant Had No
Criminal Record, Which Would Have Corroborated
Defendant's Claim That He Was Not
Predisposed to Commit the Offenses

¶ 81 The State argues that defense counsel reasonably believed it was not necessary to introduce evidence of defendant's lack of criminal history because defendant did elicit testimony that he had never been involved or attempted to have sex with minors and he presented four character witnesses who testified about defendant's good character. In addition, there was evidence at trial that defendant's cell phone and computer showed no signs of searches for sex with minors or pornographic images.

¶ 82 It is well established that a defendant's prior criminal record or lack thereof is among the factors that are most relevant in assessing a defendant's predisposition to commit an offense. *Ramirez*, 2012 IL App (1st) 093504, ¶ 43; *Criss*, 307 Ill. App. 3d at 897-98. Although there was evidence that defendant had no history of involvement with or attempting to have sex with minors, informing the jury that defendant also had no criminal history was direct evidence that would have corroborated defendant's argument to the jury that he was not predisposed to commit the charged offenses or any other offense before meeting the government agent in the hotel room. Defendant's lack of a criminal record was compelling evidence showing his lack of predisposition, and counsel's error in failing to present this evidence was objectively unreasonable because it prevented the jury from considering evidence that established defendant's entrapment defense: that he was not predisposed to have sex with minors. See *Criss*, 307 Ill. App. 3d at 899 (holding that the trial court erred in excluding evidence of defendant's lack of a criminal record). Finally, it is axiomatic that good trial strategy does not exclude exculpatory evidence.

¶ 83 C. *Strickland* Prejudice Resulted From
Counsel's Cumulative Errors, Which
Constituted Deficient Performance and
Established His Ineffectiveness

¶ 84 Defendant was prejudiced by defense counsel's three errors, which constituted deficient performance. *Strickland* prejudice is defined as "a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The appellate court succinctly stated that

"the effect of the State's burden-shifting inducement argument and the jury's confusion over predisposition was further compounded by defense counsel's failure to inform the jury that defendant had no criminal history—a fact that would have bolstered the argument that defendant was not predisposed to commit the offenses before his exposure to government agents." 2020 IL App (2d) 170900, ¶ 58.

¶ 85    The cumulative effect of defense counsel's three errors established his deficient performance: (1) allowing jury confusion by failing to provide the legal definitions of material terms in the entrapment instruction, (2) failing to object to the State's closing argument that misstated the issues to be decided by the jury in the entrapment instruction, and (3) failing to present evidence of defendant's lack of a criminal history that would have established that defendant was not predisposed to commit the offenses, an issue in the entrapment instruction. Counsel's three errors prejudiced defendant and rendered the jury's deliberations and verdict unreliable under *Strickland*, 466 U.S. at 685-86. 2020 IL App (2d) 170900, ¶ 59.

¶ 86                D. The State's Alternative Arguments Lack Merit

¶ 87    Alternatively, the State maintains that, based on the strength of its case, defendant suffered no prejudice from defense counsel's alleged errors. The State insists that the evidence demonstrated (1) that defendant was not induced to commit the charged offenses and (2) that the evidence established that defendant was predisposed to commit the charged offenses because he was ready and willing to commit the crimes without government persuasion.

¶ 88                1. Whether Defendant Was Induced to Commit
                    the Charged Offenses Is a Question of Fact for a
                    Properly Instructed Jury

¶ 89    The State maintains that the evidence demonstrated that defendant was not induced to commit the charged offenses because the government agents involved in the sting operation did no more than initiate and afford defendant the opportunity to commit the offenses. The State contends that the time frame, from introduction of the offenses until defendant's capitulation, is evidence that government agents

did not induce defendant. The State points out that defendant's text exchanges with Taub and conversations with Siffermann do not constitute the type of government conduct that is typically deemed inducement. We disagree.

¶ 90    The State relies on *Jacobson*, 503 U.S. at 553, and *Poehlman* 217 F.3d at 702, for the proposition that a longer time frame and continuous interaction over an extended period is necessary to establish inducement. In *Jacobson*, 503 U.S. at 553, the government conceded inducement in a child pornography prosecution where undercover agents devoted 30 months to convince the defendant that he had the right to engage in behavior proscribed by law. In *Poehlman*, over the course of six months and numerous e-mail messages, an undercover agent played on the defendant's need for an adult relationship and manipulated him into agreeing to serve as a sexual mentor to her underage daughters and have sexual relationships with them. 217 F.3d at 699-700.

¶ 91    The amount of time the government interacts with a defendant is not determinative of whether the government incited or induced the defendant to commit a crime. In fact, in *Sorrells*, 287 U.S. at 439-40, the relevant time frame from introduction of the crime by a government agent to commission by the defendant did not exceed 90 minutes. In *Sorrells*, a prohibition agent, after confirming that both he and the defendant were veterans of World War I, asked if the defendant could get him some liquor, and the defendant stated that he did not have any. *Id.* at 439. The agent asked again without result. After another request, the defendant left and returned with liquor. *Id.* The agent was at the defendant's home for an hour to an hour and a half. *Id.* at 439-40. The Supreme Court determined that the act for which the defendant was prosecuted was instigated by the prohibition agent, that the defendant had no previous disposition to commit it but was a law-abiding citizen, and that the agent lured the defendant, otherwise innocent, to its commission by repeated and persistent solicitation. *Id.* at 441. We find that it is the nature and extent of the government solicitation that is relevant in an entrapment case and not just the passage of time.

¶ 92    Here, the government set up a sting, and the ad used in the sting was a picture of an 18-year-old who was available for sex. The government agents employed a bait-and-switch tactic: a picture of an 18-year-old woman was used in the ad to induce defendant to discuss having sex with minors. Defendant responded to the ad

by indicating at least four times that he was not interested in having sex with minors but was interested in sex with an adult: (1) "not interested in minors. You crazy?" (2) "18 is good but nothing under that too risky"; (3) "What if I just see u. Since your above 18"; and (4) "What about u how much for u." In spite of defendant's text messages that he did not want to have sex with minors, the State did not adhere to its protocol to discontinue texting with people who, like defendant, texted that they were looking for an adult.

¶ 93    Defendant sent several text messages, all relating to adult companionship, and although it has long been accepted that agents may use artifice to catch those engaged in criminal ventures, here, defendant's request for an 18-year-old adult was ignored by the agents. See *Sorrells*, 287 U.S. at 445; *People v. Outten*, 13 Ill. 2d 21, 24 (1958) (finding that entrapment constitutes a valid defense if the officers inspire, incite, persuade, or lure the defendant to commit a crime that he otherwise had no intention of perpetrating). To overcome first defendant's refusal, then his reluctance, then his hesitancy to achieve capitulation, government agents made several offers, going so far as to deceive him that the underage girls' mother was making the offer. In addition, starting with texts at 10:02 and 24 minutes later, at 10:26, defendant asks how much for you (the mother), and Taub rebuffed his interest and returned to the underage minors. See *People v. Kulwin*, 229 Ill. App. 3d 36, 40 (1992) (finding that defendant's reluctance to engage in criminal activity was overcome by repeated government inducement); *Poehlman*, 217 F.3d at 701.

¶ 94    Here, the government's use of subterfuge, deceitful representation, and coercive tactics shown by the numerous texts and interactions between law enforcement agents and defendant may have created the risk and established that defendant would not commit the crimes if left to his own devices but did so in response to the government's inducement. See *Sorrells*, 287 U.S. at 441 (an agent asked for liquor and was twice refused, but upon asking a third time the defendant finally capitulated, and the Supreme Court found that the defendant was entrapped).

¶ 95    The question for the jury in this case was whether defendant with no prior criminal history and no history of engaging in sexual relations with minors is incited or induced by the government when he is solicited in a sting operation with an ad containing a picture of an 18-year-old but, upon making contact with the government, is encouraged to engage in sexual activity with minors.

¶ 96     We reject the State's contention that the evidence demonstrated that defendant was not induced and find that defendant has presented sufficient evidence that he was induced by the government's agents. Thus, whether defendant was incited or induced by the government's agents to commit the charged offenses is a question of fact for a properly instructed jury: a jury that received the legal definitions for the words "incited," "induced," and "predisposed."

¶ 97                    2. Whether Defendant Was Predisposed to
                       Commit the Charged Offenses Is a Question of
                       Fact for a Properly Instructed Jury

¶ 98     The State maintains that the evidence established that defendant was ready and willing to commit the crime without persuasion and before his initial exposure to government agents. The State contends that evidence of defendant's conduct after the initial contact by government agents remains relevant to the determination of predisposition. Although the State initiated the discussion about sex with minors, in the State's view, defendant's comments in the hotel between him and Siffermann, that he believed that "14 and 15 year-old girls were old enough to have sex" and the type of sex he would have with the girls as "porno sex," are evidence of his predisposition to commit the charged offenses. The State argues that the government *used* minimal inducement and that defendant's slight expression of hesitation supports that defendant was predisposed to commit the offenses.

¶ 99     There are six factors to be considered in determining whether a defendant was predisposed to commit a crime: (1) the character of the defendant, (2) defendant's lack of a criminal record, (3) whether the defendant had a history of criminal activity for profit, (4) whether the government initiated the alleged criminal activity, (5) the type of inducement or persuasion applied by the government or the way in which it was applied, and (6) whether the defendant showed hesitation in committing the crime, which was only overcome by repeated persuasion. *Ramirez*, 2012 IL App (1st) 093504, ¶ 38.

¶ 100    The evidence of the first factor favors defendant because (1) four character witnesses, his sister, his niece, and two coworkers who knew defendant, testified that he never said or acted in a way that indicated he was inclined or predisposed to having sex with minors; (2) there was no evidence in his computer that he had

inappropriate pictures of minors or Internet searches for child pornography; (3) there was no evidence in his phone that he had inappropriate pictures of minors or Internet searches for child pornography; and (4) there was no evidence that he previously tried to solicit a minor for sex.

¶ 101　　The State counters defendant's character evidence by pointing to defendant's statements that "naturally they are old enough" but the "law says they are not" and that, "once a girl has her period, she's ready for that kind of thing." The State maintains that these statements indicate that defendant's character was predisposed and susceptible to having sex with minors.

¶ 102　　We find, and the State agrees, that the second, third, and fourth factors favor defendant. Defendant does not have a criminal record and does not have a history of engaging in criminal activity for profit, and the government initiated the alleged criminal activity and constructed the sting operation with a picture of an 18-year-old female to incite or induce individuals to begin a text discussion about having sex with minors.

¶ 103　　The fifth factor, the type of inducement or persuasion applied by the government, as previously stated, may have crossed the line and entrapped defendant. Here, the State maintains that the amount of inducement in this case was "exceedingly minimal." We observe that defendant's eventual capitulation may have been in response to the government's numerous texts and repeated attempts at persuasion. Taub and Siffermann continually diverted defendant by complimenting him and assuring him that it was okay, and by telling him that the minors wanted to participate. The government agents also incited and induced defendant and sanctioned the illegal activity by holding themselves out as the minors' parent who consented to this illegal activity. The agents' parental consent may have contributed to defendant's decision to consider engaging in sexual activity with minors. See *Russell*, 411 U.S. at 429 (finding that to establish whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal); *Jacobson*, 503 U.S. at 548 (holding that government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the government may prosecute); *Sorrells*, 287 U.S. at 445 (same).

¶ 104    Regarding the sixth factor, the State maintains that defendant's hesitation was not in relation to having sex with minors but rather focused on the possibility of being set up and arrested. The State finds support in defendant's comments that he was (1) "just nervous, like a set up or something," (2) "when you're telling me their ages, I'm like this sounds like they're trying to like lure somebody in," and (3) "leave me alone with my pants down and somebody might come in or something," and he was nervous just saying their ages. Although, defendant's reluctance may have been the result of caution, the fact remains that his earliest messages, which are the most indicative of his preexisting state of mind, showed he declined the offer of sex with minors and offered on two occasions to have sex with the adult texter: (1) "not interested in minors. You crazy?"; (2) "18 is good but nothing under that too risky"; (3) "What if I just see u. Since your above 18"; and (4) "What about u how much for u." Defendant also said that he was "not like even into that."

¶ 105    We acknowledge that, under the totality of the circumstances, defendant's ultimate acquiescence in paying for sex with two minors must be considered. However, because defendant had no criminal history or involvement with minors, his acquiescence could have been the consequence of the government's persuasive incitement or inducement. In addition, there is no requirement that defendant demonstrate an attempt to withdraw once induced into committing the offenses. *People v. Poulos*, 196 Ill. App. 3d 653, 663 (1990). In fact, the entrapment statute makes it clear that "[a] person is not guilty of an offense if his or her conduct is incited or induced." 720 ILCS 5/7-12 (West 2014). The agents, acting as the minors' mother, continually indicated that this was alright, that the minors had done it before, that they wanted to do it, and that defendant was "not crazy" or a "creep" for agreeing to engage in this criminal conduct. See *Jacobson*, 503 U.S. at 553-54 (determining that, when the government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene).

¶ 106    Defendant's predisposition evidence established (1) no criminal background, (2) no criminal history of interacting with minors, and (3) no minors' pictures on his phone or computer prior to texting with the government. Therefore, we reject the State's contention that the evidence established that defendant was predisposed to commit the offenses and find that defendant presented sufficient evidence that

he may not have been ready and willing to commit the crimes without government persuasion. Accordingly, we find that whether defendant was predisposed to commit the offenses prior to interacting with the government is a question of fact for a properly instructed jury.

¶ 107                              III. CONCLUSION

¶ 108        In summary, we find that defense counsel erred where he (1) acquiesced to the circuit court's responses to the jury questions regarding the "legal definition" of "incited," "induced," and "predisposed," which are material terms in the entrapment instruction; (2) after presenting defendant's entrapment defense, did not object to the State's closing argument that misstated the State's burden on two issues to be analyzed and considered by the jury in the entrapment instruction: (a) the government's incitement and inducement of defendant and (b) defendant's predisposition to commit the offenses because the government merely afforded him the opportunity; and (3) failed to present evidence of defendant's lack of a criminal record, which addresses whether defendant was predisposed, an issue in the entrapment instruction. We hold that *Strickland* prejudice resulted from defense counsel's cumulative errors, which constituted deficient performance and established his ineffectiveness, rendering the jury deliberations and verdict unreliable. Accordingly, we reverse defendant's convictions and remand the cause to the circuit court for a new trial.

¶ 109        In addition, we must review the sufficiency of the evidence to determine adequacy for double jeopardy purposes. After reviewing the evidence in the light most favorable to the State, we conclude that the evidence is sufficient to support the jury's verdicts beyond a reasonable doubt. Because we remand for a new trial, we need not address defendant's request for cross-relief.

¶ 110        Appellate court judgment affirmed.

¶ 111        Circuit court judgment reversed and remanded.

¶ 112        JUSTICE MICHAEL J. BURKE, dissenting:

- 32 -

¶ 113    A defendant who claims his trial counsel was ineffective must show both that (1) counsel's performance was deficient and (2) prejudice resulted from that deficiency. *People v. Eubanks*, 2021 IL 126271, ¶ 30 (citing *Strickland v. Washington*, 466 U.S. 668, 681, 691-92 (1984)). The majority concludes that defense counsel was deficient for (1) not objecting to the State's closing argument on entrapment, (2) acquiescing to the trial court's decision not to give a supplemental instruction on the definition of "predisposed," and (3) failing to present evidence that defendant lacked a criminal history. The majority does not address whether the result of the proceeding would have been different absent counsel's omissions, as if resolving the *Strickland* performance issue in defendant's favor is dispositive. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). Regardless of whether counsel was deficient, defendant was not prejudiced by counsel's presentation of the entrapment defense. *People v. Cherry*, 2016 IL 118728, ¶ 24 (a defendant's failure to establish either deficient performance or prejudice precludes a finding of ineffective assistance of counsel).

¶ 114    The entrapment defense consists of two related elements: (1) government incitement or inducement of an offense and (2) the defendant's lack of predisposition to commit the offense. *Mathews v. United States*, 485 U.S. 58, 63 (1988). The majority concludes that "once defendant sufficiently raises an entrapment defense, the entrapment statute requires the State to prove (1) defendant was predisposed and (2) the government agents merely afforded him the opportunity or facility for committing the offenses." *Supra* ¶ 73 (citing 720 ILCS 5/7-12 (West 2014)). The majority misreads the entrapment statute and prior decisions on the issue.

¶ 115    According to the majority, the State must prove predisposition in every entrapment case and cannot rebut the defense by disproving government inducement alone. This means that slight evidence of government inducement does not just entitle a defendant to the entrapment instruction, it removes the inducement issue from the jury's consideration entirely. The majority's interpretation renders the first half of the instruction superfluous.

¶ 116    It is well settled that the pattern instruction should be given when a defendant presents slight evidence of entrapment, which is defined as government inducement *and* a lack of predisposition to commit the offense. *People v. Placek*, 184 Ill. 2d

370, 380-81 (1998) ("[T]o establish the entrapment defense, the evidence must show (1) that the State improperly induced the defendant to commit the crime and (2) that the defendant lacked the predisposition to commit the crime."). Even if the trial court exercises its discretion in giving the instruction, the entrapment defense nevertheless fails if the State proves beyond a reasonable doubt that (1) the government did not incite or induce the offense *or* (2) the defendant was predisposed to commit the offense. The pattern instruction on entrapment and the State's closing argument accurately articulated the elements of entrapment and the State's burden of proof. Moreover, the jury heard overwhelming evidence that the government did not incite or induce defendant to commit the offense. Under these circumstances, defendant has not demonstrated prejudice under *Strickland*, and his ineffective-assistance claim fails. I respectfully dissent.

¶ 117                                    A. Closing Argument

¶ 118          The majority concludes trial counsel was ineffective for failing to object to the State's closing argument on inducement and predisposition, because the State "misstated the issues to be decided by the jury." *Supra* ¶ 85. The prosecutor told the jury, "[i]f you find that the police did incite or induce him, then you can look at the next step," indicating predisposition. The appellate court found the State had improperly directed the jury to consider inducement before predisposition. 2020 IL App (2d) 170900, ¶ 46. The majority does not explain how the State's two-step articulation of entrapment was error, except to summarily conclude that the State could rebut the entrapment defense only by proving defendant was predisposed to commit the offense and the government merely afforded him the opportunity. *Supra* ¶ 77.

¶ 119          The prosecutor also told the jury that the State had the burden to prove that defendant "was willing to do this and the opportunity was there." The majority agrees with defendant that the jury was misled on the predisposition element because the jury was not explicitly instructed on the "reference to the temporal focus." *Supra* ¶ 79.

¶ 120          The question of whether defendant was prejudiced by counsel's failure to object turns on whether the State's closing argument misstated the law on entrapment, which it did not. The Illinois entrapment statute provides

"A person is not guilty of an offense if his or her conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of that person. However, this Section is inapplicable if the person was pre-disposed to commit the offense and the public officer or employee, or agent of either, merely affords to that person the opportunity or facility for committing an offense." 720 ILCS 5/7-12 (West 2014).

¶ 121    Section 7-12 matches the pattern instruction on entrapment, which also sets forth the inducement and predisposition elements separately in two sentences:

"It is a defense to the charge made against the defendant that he was entrapped, that is, that for the purpose of obtaining evidence against the defendant, he was incited or induced by [(a public officer) (a public employee) (an agent of a public officer) (an agent of a public employee)] to commit an offense.

However, the defendant was not entrapped if he was predisposed to commit the offense and [(a public officer) (a public employee) (an agent of a public officer) (an agent of a public employee)] merely afforded to the defendant the opportunity or facility for committing an offense." Illinois Pattern Jury Instructions, Criminal, No. 24-25.04 (4th ed. 2000) (hereinafter IPI Criminal 4th).

¶ 122    The entrapment statute and the pattern jury instruction have the same plain and ordinary meaning. A person is entrapped if the government incites or induces the commission of an offense. But even if the person is incited or induced by the government, the person is not entrapped (*i.e.*, "this Section is inapplicable") if he is predisposed to commit the offense and the government merely affords the opportunity for criminality. Stated another way, a person is *not* entrapped under section 7-12 if (1) the government does not incite or induce *or* (2) the predisposition clause renders section 7-12 inapplicable.

¶ 123    Logic dictates that, because a defendant is entrapped if (1) the government incites or induces *and* (2) the defendant lacks predisposition, a defendant is *not* entrapped if (1) the government does not incite or induce *or* (2) the defendant is predisposed.

¶ 124       The majority's misapprehension of the law can be traced to what a defendant must show to claim entrapment and how the burden shifts to the State to disprove it. The trial court gave the pattern instruction based on a finding that at least slight evidence supported the affirmative defense.[3] *People v. Hari*, 218 Ill. 2d 275, 296 (2006) (where there is some evidence to support an affirmative defense instruction, the trial court's refusal to instruct the jury constitutes an abuse of discretion even if the evidence is conflicting, because "[v]ery slight" evidence upon a given theory will justify giving the instruction). Once a defendant presents some evidence to support an entrapment defense, the State bears the burden to *rebut* the defense beyond a reasonable doubt, in addition to proving all the elements of the crime. *Placek*, 184 Ill. 2d at 381.

¶ 125       "[T]o *establish* the entrapment defense, the evidence must show (1) that the State improperly induced the defendant to commit the crime *and* (2) that the defendant lacked the predisposition to commit the crime." (Emphases added.) *Id.* at 380-81. The State bears the burden of proof at trial, but the State is not the party *establishing* the defense. The State is charged with *rebutting* the defense. A defendant claiming entrapment must show slight evidence of government inducement *and* a lack of predisposition. Conversely, for the State to prevail, the evidence must show a lack of government inducement *or* defendant's predisposition, and the State has the opportunity to present evidence on both. The State must disprove entrapment beyond a reasonable doubt, but it need only rebut one of the two elements to do so.

¶ 126       The majority concludes that, once a defendant sufficiently raises an entrapment defense, section 7-12 requires the State to prove the defendant was predisposed to committing the offense and the government agents merely afforded him the opportunity or facility to do so. *Supra* ¶ 73. The majority's interpretation conflicts with the plain and ordinary meaning of the entrapment statute and the pattern

---

[3]One could argue the trial court would not have abused its discretion had it denied the entrapment instruction, based on the undisputed evidence that the government simply offered defendant the opportunity to commit the offense. *Jacobson v. United States*, 503 U.S. 540, 550 (1992) ("Had the agents in this case simply offered petitioner the opportunity to order child pornography through the mails, and petitioner–who must be presumed to know the law–had promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction.").

instruction. If the State presents proof beyond a reasonable doubt that the defendant was not incited or induced by the government to commit the offense, the person is not entrapped, even if the trial court has exercised its discretion to give the instruction based on slight evidence.

¶ 127 Moreover, the issues instruction on entrapment states the proposition "[t]hat the defendant was not entrapped," not that the defendant was not predisposed. IPI Criminal 4th No. 24-25.04A. Entrapment is composed of government inducement and a lack of predisposition. If, as the majority claims, the State cannot rebut entrapment by disproving government inducement, both the definition instruction and the issues instruction would refer only to predisposition.

¶ 128 The majority, by deciding that slight evidence of government inducement removes the issue from the jury's consideration, has turned the law of affirmative defenses on its head. For example, an instruction for self-defense is given in a homicide case where there is some evidence in the record that, if believed by a jury, would support a claim of self-defense. *People v. Everette*, 141 Ill. 2d 147, 157 (1990). Like entrapment, self-defense is an affirmative defense, meaning that, unless the State's evidence raises the issue involving the alleged defense, the defendant bears the burden of presenting evidence sufficient to raise the issue. *Id.* But under the majority's reasoning, slight evidence of self-defense would remove the issue from the jury's consideration entirely and preclude the State from rebutting the defense beyond a reasonable doubt.

¶ 129 Slight evidence supporting an affirmative defense shifts the burden to the State to disprove the elements of the defense beyond a reasonable doubt. But the majority, without explanation, denies the State the opportunity to meet its burden of disproving one of those elements—government inducement—in entrapment cases. When a trial court exercises its discretion in giving the entrapment instruction, the burden of proof shifts to the State to disprove inducement or prove predisposition beyond a reasonable doubt. *United States v. Mayfield*, 771 F.3d 417, 440 (7th Cir. 2014) (the State may prevail "by proving either that the defendant was predisposed to commit the crime or that there was no government inducement" (emphasis omitted)).

¶ 130 Inducement and lack of predisposition are related elements (*Mathews*, 485 U.S. at 63) that are set forth separately in the two sentences of section 7-12. The majority

is correct that the first sentence comprises the inducement element. The majority also concludes that the second sentence, which comprises the predisposition element, requires the State to prove beyond a reasonable doubt that the government merely afforded the opportunity or facility for committing an offense. I wish to clarify that the second sentence of section 7-12 does not comprise both the government-inducement and predisposition elements. 720 ILCS 5/7-12 (West 2014). Affording the opportunity to commit an offense is not the same as inducement:

> "[I]nducement means more than mere government solicitation of the crime; the fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement. Instead, inducement means government solicitation of the crime plus some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Mayfield*, 771 F.3d at 434-35.

¶ 131 The State cannot simultaneously prove (1) a lack of government inducement and (2) government inducement plus defendant's predisposition. The statute's references to predisposition and opportunity simply reflect the relatedness of entrapment's two elements. If a defendant is predisposed to commit the offense, he will require little or no inducement to do so, just an opportunity; conversely, if the government must work hard to induce a defendant to commit the offense, it is far less likely that he was predisposed. See *United States v. Poehlman*, 217 F.3d 692, 698 (9th Cir. 2000). The prosecutor, when arguing to the jury that defendant "was willing to do this and the opportunity was there," was paraphrasing the second sentence of section 7-12. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007) (a prosecutor has wide latitude in making closing arguments).

¶ 132 Moreover, any error that might have resulted from the prosecution's argument concerning a two-step analysis of the entrapment elements was cured when both sides argued—and the trial court instructed the jury—that the State bore the burden of proving that defendant was "not entrapped." Even if the jury was mistaken that it must consider government inducement before defendant's predisposition, defendant was not prejudiced. As explained below, the evidence of a lack of government inducement was overwhelming.

¶ 133                                  B. Supplemental Instruction

¶ 134        Assuming *arguendo* that counsel was deficient for failing to tender a definition
of "predisposed" when the jury twice asked for one, defendant has failed to show a
reasonable probability that the result of the proceeding would have been different
if counsel had requested an instruction. See *Manning*, 241 Ill. 2d at 327. Counsel's
omission neither undermined the confidence in the outcome nor rendered the result
of the trial unreliable or fundamentally unfair because the jury had been properly
instructed on entrapment. See *People v. Evans*, 209 Ill. 2d 194, 220 (2004).

¶ 135        The commonly understood meaning of "predisposed" and its legal definition in
the entrapment context are the same. Defendant was not prejudiced when counsel
acquiesced to the trial court's decision not to define "predisposed," because the
instructions that were given stated the law correctly.

¶ 136        "Predisposed" means "having a predisposition," "inclined," or "susceptible."
Webster's Third New International Dictionary 1786 (1993). "Predisposition" is
similarly defined as "[a] person's inclination to engage in a particular activity."
Black's Law Dictionary 1216 (8th ed. 2004).

¶ 137        Consistent with the dictionary definitions, "predisposition" in the entrapment
context refers to the defendant's inclination to engage in criminal activity. It is well
settled that "predisposition" means the defendant was ready and willing to commit
the crime without persuasion and before his or her initial exposure to government
agents. *People v. Bonner*, 385 Ill. App. 3d 141, 146 (2008) (quoting *People v. Criss*,
307 Ill. App. 3d 888, 897 (1999)); see also *People v. Ramirez*, 2012 IL App (1st)
093504, ¶ 38; *People v. Sanchez*, 388 Ill. App. 3d 467, 474 (2009).

¶ 138        The commonly understood meaning of "predisposition" already incorporates
the relevant point at which the defendant's disposition should be determined.
"Quite obviously, by the time a defendant actually commits the crime, he will have
become disposed to do so." *Poehlman*, 217 F.3d at 703. However, "the relevant
time frame for assessing a defendant's disposition comes before he has any contact
with government agents, which is doubtless why it's called *pre*disposition."

- 39 -

(Emphasis in original.) *Id.* (citing *Jacobson v. United States*, 503 U.S. 540, 549 (1992)). "Predisposition" contains the prefix "pre" because the relevant timeframe for assessing a defendant's disposition to commit the offense is *before* he has any contact with government agents.

¶ 139    The jury received the pattern instruction, which itself gives temporal context to "predisposed" by referring to contact with government agents, who merely afford the opportunity for committing the offense. IPI Criminal 4th No. 24-25.04 ("the defendant was not entrapped if he was predisposed to commit the offense and [a government agent] merely afforded to the defendant the opportunity or facility for committing an offense").

¶ 140    Illinois courts have long held that, "[w]hen words in a jury instruction have a commonly understood meaning, the court need not define them with additional instructions. [Citation.] This is especially true where the pattern jury instructions do not provide that an additional definition is necessary." *Sanchez*, 388 Ill. App. 3d at 477-78; *People v. Trout*, 2021 IL App (1st) 191733-U, ¶ 20; *Schnitker v. Springfield Urban League, Inc.*, 2016 IL App (4th) 150991, ¶ 40; *People v. Clark*, 2015 IL App (3d) 140036, ¶ 34; *People v. Manning*, 334 Ill. App. 3d 882, 890 (2002); *People v. Washington*, 184 Ill. App. 3d 703, 708-09 (1989); *People v. Hicks*, 162 Ill. App. 3d 707, 713 (1987) (a term employed in a general, nontechnical context need not be defined as long as nothing in the instruction obscures its meaning); *People v. Johnson*, 98 Ill. App. 3d 228, 234 (1981) (an instruction specifically defining "theft" is unnecessary because the word in common usage generally means the unlawful taking of property). The pattern instruction on entrapment given in this case (IPI Criminal 4th No. 24-25.04) neither obscured the meaning of its terms nor required additional definitions. Under the unique circumstances presented here, defendant has not shown a reasonable probability that the result of the proceeding would have been different if counsel had tendered a supplemental instruction in response to the jury's questions. *Manning*, 241 Ill. 2d at 327.

¶ 141    The majority summarily concludes that "counsel's error [in not tendering a definition] resulted in the jury being *improperly instructed* on how to apply the legal terms to the facts and prevented them from analyzing the evidence to determine defendant's guilt." (Emphasis added.) *Supra* ¶ 70. The majority does not

bother to discern the common meaning of "predisposed" or attempt to contrast it with the legal definition. The majority characterizes the trial court's response as "prejudicial error," without assessing the probability that the result of the proceeding would have been different if counsel had tendered a supplemental instruction. The majority cites no authority for the proposition that *Strickland* prejudice may be presumed when counsel fails to tender a definition requested by the jury. But the majority opinion could be interpreted to mean that prejudice results any time the trial court declines the jury's request to define a word in an instruction, even if the commonly understood meaning and the legal definition are the same. Imposing such a rule, especially in a case like this where the pattern instruction does not call for an additional definition, risks misleading the jury depending on how a commonly understood word is defined.

¶ 142                           C. Government Inducement

¶ 143       Finally, the outcome of the proceeding would not have been different absent all of counsel's omissions because the evidence disproving government inducement was overwhelming. "Inducement" means government solicitation of the crime plus some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts. *Mayfield*, 771 F.3d at 434-35. The additional government conduct can include repeated attempts at persuasion; fraudulent representations; threats; coercive tactics; harassment; promises of reward beyond that inherent in the customary execution of the crime; or pleas based on need, sympathy, or friendship. *Id.* at 435; see also *Bonner*, 385 Ill. App. 3d at 145 (inducement to commit drug offense shown where government informant not only furnished the opportunity but solicited "constantly" and overcame the defendant's refusals by offering sexual favors).

¶ 144       The State concedes the government agents solicited defendant to pay for sex with underage girls. The majority describes the government's tactics as a "bait-and-switch" involving an advertisement with "a picture of an 18-year-old woman." *Supra* ¶ 92. The poster's age was listed as "18," but the photograph depicts a postpubescent female from the neck down who easily could have been under 18. Regardless of her age or whether the government engaged in a "bait and switch,"

- 41 -

resorting to artifice to post the advertisement was not improper because these types of crimes are committed in secret. See *People v. Outten*, 13 Ill. 2d 21, 24 (1958).

¶ 145     The brief timeline, the content, and the tone of defendant's contact with the government agents disproves the inducement element. Defendant answered the advertisement at 10:02 p.m. Less than 10 minutes later, at 10:11 p.m., Agent Taub informed defendant that the girls available for sex were 14 and 15 years old. Defendant responded that he was not interested in minors because they were "too risky," and he inquired whether Agent Taub was "affiliated with the law or something." Agent Taub reassured defendant, and at 10:19 p.m., defendant volunteered that "naturally, [the girls] were old enough" to have sex, even if "the law says they are not."

¶ 146     Within 11 minutes of learning the girls' ages, defendant asked for more photographs and for the location of the hotel where they would be made available for sex. Within 17 minutes of learning their ages, defendant sent a text message agreeing to pay $200 for sex with girls he thought were 14 and 15 years old.

¶ 147     At the hotel, Agent Siffermann posed as the girls' mother. Defendant made several comments expressing nervousness. After each comment, Agent Siffermann gave a one-word response, such as "Ok," "Sure," or "Yeah." Agent Siffermann did not cajole defendant or try to persuade him to have sex with minors. She merely explained that she preferred to "meet the guys first just to make sure" they were not "creeps." Defendant replied that, even though he "just found out" about the girls' ages, he "had to come by" because he was "curious."

¶ 148     Defendant told Agent Siffermann he was "nervous" the transaction was a "set up or something." She replied, "you can see me, I'm here, so everything's fine," indicating the opportunity to commit the offense. Defendant reiterated that, "when you're telling me their ages, I'm like this sounds like they're trying to lure somebody in." Agent Siffermann replied she preferred to "meet everyone first ahead of time just to make sure that they're safe." Moments before retrieving $200, defendant stated "I mean like naturally I think that you know, once a girl has her period she's ready for that kind of thing but *** legally obviously *** it's not the right thing."

¶ 149       The text-message exchange and the hotel-room conversation prove the government agents merely afforded defendant the opportunity to commit the offense; the agents did not engage in additional conduct amounting to inducement. When defendant was offered the opportunity to have sex with an underage girl, he did not cut off communication or express disgust. Instead, he sought and received assurances that the agents were not law enforcement, and within minutes, he agreed to pay for sex with *two* girls he believed to be 14 and 15 years old. Defendant repeatedly expressed curiosity and twice cited the girls' physical maturity to rationalize his decision. To the extent defendant expressed nervousness, it was only over the risk of getting caught. By contrast, the agents did not beg, threaten, coerce, harass, promise an extra reward, or make pleas based on need, sympathy, or friendship. When afforded the opportunity to pay for sex with underage girls, defendant talked himself into it within minutes.

¶ 150       Under these undisputed facts, there was no risk that a person who would otherwise not commit the crime would do so in response to the government's efforts. In light of the overwhelming evidence of lack of inducement, defendant has not shown a reasonable probability that the outcome of the trial would have been different if counsel had tendered a definition for "predisposed," objected to the State's argument on entrapment, or informed the jury of defendant's lack of a criminal history.

¶ 151                                    D. Conclusion

¶ 152       A defendant is entitled to the pattern entrapment instruction if he presents slight evidence of government inducement *and* his own lack of predisposition. When the trial court allowed defendant to present the entrapment defense, the burden shifted to the State to disprove inducement, or prove predisposition, beyond a reasonable doubt.

¶ 153       Counsel's omissions at trial did not prejudice defendant because neither the instruction on entrapment nor the prosecution's closing argument misstated the law and the State disproved the government-inducement element by overwhelming evidence. For the preceding reasons, I would reverse the judgment of the appellate court and address the issues raised by defendant in his cross-appeal.

¶ 154          JUSTICES THEIS and CARTER join in this dissent.

APPENDIX I



PEOPLE'S EXHIBIT # __3__
FOR IDENTIFICATION

APPENDIX II

People v. Shane R. Lewis, 15 CF 44
Aurora Police Report #15-522

S.A. SIFFERMANN: Hi!

LEWIS: Hello, I'm (Inaudible)

S.A. SIFFERMANN: Come on in, good, how are you?

LEWIS: Good, how are you?

S.A. SIFFERMANN: I'm Michelle.

LEWIS: Shane.

S.A. SIFFERMANN: Come in, sit down.

LEWIS: Nice to see you.

S.A. SIFFERMANN: Thanks. Nice to see you. Sorry.

LEWIS: Smells like you just got done cooking.

S.A. SIFFERMANN: No.

LEWIS: No? Smells like cooking.

S.A. SIFFERMANN: No, no, we got take out.

LEWIS: Gotcha.

S.A. SIFFERMANN: So, um, so you're good, you want the 14 year old and...

LEWIS: I'm, I'm a little nervous, the age like, it's not like I'm even in to that, honestly.

S.A. SIFFERMANN: Ok.

LEWIS: Um, I didn't have any clue like that when I texted you originally.

S.A. SIFFERMANN: Ok.

LEWIS: But I put four or five hits out here, you're the only one to answer me.

S.A. SIFFERMANN: Ok, ok.

LEWIS: So I don't, in all honestly I'm very nervous to tell you the truth, like I feel...
S.A. SIFFERMANN: Sure.

LEWIS: ...weird about it with them being young like that.

1 of 7

PEOPLE'S EXHIBIT # 10
FOR IDENTIFICATION

S.A. SIFFERMANN: Yeah, ok, um.

LEWIS: (laugh) You know what I mean?

S.A. SIFFERMANN: Yeah. Well that's...

LEWIS: And I just like.

S.A. SIFFERMANN: ...that's why, I like to, I like to meet the guys first just to make sure that they're not...

LEWIS: I don't even know...

S.A. SIFFERMANN: ...crazy

LEWIS: ...like really I just found out, I just like I'm curious, that's why I had to...

S.A. SIFFERMANN: Yeah.

LEWIS: ...come by. I think I am more, just nervous, like set up or something, you know what I mean?

S.A. SIFFERMANN: Yeah, no, I mean...

LEWIS: Like...

S.A. SIFFERMANN: I think it would be too late for that now, you can see me, I'm here, so everything's fine. I just want to make sure that you're not...

LEWIS: It just makes me nervous, I don't know why.

S.A. SIFFERMANN: Yeah.

LEWIS: No I'm not, definitely not.

S.A. SIFFERMANN: Ok, you're not?

LEWIS: No, just got off work, I'm actually here from Philly.

S.A. SIFFERMANN: Oh, ok

LEWIS: It was just, um, you know, I was worried like I don't do this very often and when you're telling me their ages, I'm like this sounds like they're trying to like lure somebody in...

S.A. SIFFERMANN: Ooooh.

LEWIS: ...that likes younger girls.

S.A. SIFFERMANN: Oh fuck no. Yeah.

LEWIS: Yeah.

S.A. SIFFERMANN: I just like to meet everyone first ahead of time just to make sure that they're safe. You know...

LEWIS: And I was thinking that if it was a trap, they would probably advertise on BackPage that it was younger and you didn't, you know what I mean...

S.A. SIFFERMANN: No.

LEWIS: (Inaudible)

S.A. SIFFERMANN: And you have to tell someone if they're a cop and I'm not a cop.

LEWIS: That's why I asked.

S.A. SIFFERMANN: And you're not a cop.

LEWIS: That's why I asked you...

S.A. SIFFERMANN: Yeah, exactly.

LEWIS: ...that (inaudible).

S.A. SIFFERMANN: Cuz otherwise, yeah.

LEWIS: It's hot in here.

S.A. SIFFERMANN: Yeah, take your coat off. Relax. So I just want to be sure, um, before ahead of time, like I like to meet everybody, but you know you look like a nice guy so I'm not as worried. You can get some real creeps out there.

LEWIS: Sure.

S.A. SIFFERMANN: ...you know what I mean? Um...

LEWIS: I just wanna get shizzed.

S.A. SIFFERMANN: Yeah. (laughing) So, I just want to make sure that, no anal,

LEWIS: No.

S.A. SIFFERMANN: Yeah, and condoms.

LEWIS: Fine.

S.A. SIFFERMANN: No matter what. Ok. So, um, I'll bring both girls up, do you, do you know ahead of time, like I just want to prepare them, they have a little bit of experience but obviously they're not like, they're not pros. You know what I mean.

LEWIS: Sure, sure.

S.A. SIFFERMANN: I mean, they're younger so, did you...

LEWIS: I don't really have much of a plan now I guess I was more just kind of curious and nervous at the same time but um...

S.A. SIFFERMANN: Yeah.

LEWIS: ...um, are, I mean we, we can show them the way.

S.A. SIFFERMANN: Ok, ok.

LEWIS: You're not weird about that if you're there and I'm like do this or tell them to do that.

S.A. SIFFERMANN: No, I'm gonna tell them ahead of time and then I'll be close. I, I will be honest with you, I'll be right outside...cuz I don't...there's only so much I can do you know cuz, they'll like, you know, one's my stepdaughter and the other girl's my daughter, the 14 year old's my daughter, so, I'm still like, you know, like, so I'll be close by.

LEWIS: Well I knew you would be here cuz that kind of makes me more nervous cuz I mean I feel like you're going to leave me alone with them too. And then...

S.A. SIFFERMANN: Ok.

LEWIS: Something's going to happen.

S.A. SIFFERMANN: Ok, that's fine, that's fine. I mean I can just stay in the bathroom with the door open.

LEWIS: You know what I'm saying though?

S.A. SIFFERMANN: Yeah, I see it, yeah, yeah.

LEWIS: Leave me alone with my pants down and somebody might come in or something.

S.A. SIFFERMANN: Oh, fuck no, that would be...no, no, yeah, um.

LEWIS: The girls have school tomorrow?

S.A. SIFFERMANN: Yeah.

LEWIS: Yeah.

S.A. SIFFERMANN: Yeah, it's a late start.

LEWIS: Ok.

S.A. SIFFERMANN: So, but we'll be gone by, I mean check out's like at noon or something.

LEWIS: (inaudible)

S.A. SIFFERMANN: We'll be gone before then. But they have their own routine in the morning anyway, it takes them too long to get ready, and I usually have to clean up the place cuz they're teenagers and they fuckin trash everything you know what I mean?

LEWIS: You sure they're I mean they're totally cool without the (inaudible)?

S.A. SIFFERMANN: Yeah, I'm going to call them ahead of time, like it's ok, like I met him, he's not some ugly freak, you know, 'cuz there are some freaks out there and I meet them and I'm like no, sorry pretty much, you know.

LEWIS: This makes me nervous just saying their ages, like why don't you just tell me they are eighteen and nineteen please. (laughs)

S.A. SIFFERMANN: Well, yea, (laughs) I, I don't know 'cuz I don't want anyone to be like, you know go, like if I go psycho on me or anything.

LEWIS: I mean like naturally I think that you know, once a girl has her period she's ready to that kind of thing but....

S.A. SIFFERMANN: Yeah.

LEWIS: legally, obviously...

S.A. SIFFERMANN: Yeah.

LEWIS: ...it's not the right thing (laughs).

S.A. SIFFERMANN: Yeah, well I just want to make sure that you know, that you're not going to do anything freaky or anything else like that but you know I'll be right in the bathroom then.

LEWIS: And just like that, just sex, like...

S.A. SIFFERMANN: Ok.

LEWIS: Like porno sex, just sex.

S.A. SIFFERMANN: Ok, well you're good, you seem like a good guy.

LEWIS: I'm a good man, I'm just really nervous so I don't really know...

S.A. SIFFERMANN: Yeah. No.

LEWIS: ...so you have to stay here too, I don't like you leaving I feel like someone's...

S.A. SIFFERMANN: Oh, I won't, I won't leave then, I'll just finish brushing my teeth.

LEWIS: I'm not gonna give any money to them, only to you.

S.A. SIFFERMANN: Ok, ok.

LEWIS: (inaudible)

S.A. SIFFERMANN: Do you have money?

LEWIS: Yeah.

S.A. SIFFERMANN: I just want to make sure yeah.

S.A. SIFFERMANN: Are you here for work?

LEWIS: Yeah.

S.A. SIFFERMANN: For like for a week? Cuz we could be here.

LEWIS: Just until Saturday night.

S.A. SIFFERMANN: I guess it's cold in Philadelphia too, though.

LEWIS: It is, not quite this cold but it's still cold yeah.

S.A. SIFFERMANN: Yeah.

LEWIS: It was like, it was getting cold when I left there actually so.

S.A. SIFFERMANN: Yeah. Have you been here like through the holidays?

LEWIS: No, I just got here Tuesday.

Page 6 of 7

S.A. SIFFERMANN: Oh, ok.

S.A. SIFFERMANN: Are you staying close by?

LEWIS: Downers Grove, do you know where that's at?

S.A. SIFFERMANN: Yeah.

LEWIS: Not too far

S.A. SIFFERMANN: No.

LEWIS: Twenty minutes or so.

S.A. SIFFERMANN: Ok.

LEWIS: You from here?

S.A. SIFFERMANN: Yeah, South Side. I've been to Philadelphia, I tried all the cheese cake, it's ok. Ok, I'm just gonna tell them it's fine. Ok, I'm just gonna brush my teeth. I'll be right here.

LEWIS: All right, all right.

POLICE 1: Police. Don't move

LEWIS: I didn't do anything, sir.

POLICE 2: Stand up, stand up.

POLICE 1: Put your hands behind your back.

LEWIS: I told her I didn't want anything to do with younger, young, young, that's what I told her. I said...

POLICE 1: Any guns, knives, weapons or anything?

LEWIS: No.

POLICE 1: Anything in your waistband?

LEWIS: No, nothing's in there.


END OF TRANSCRIPTION

Page 7 of 7

- 52 -