2024 IL App (1st) 230298-U

No. 1-23-0298

Order filed July 19, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 5277 |
| | ) | |
| DANIEL A. VALENZUELA, | ) | Honorable |
| | ) | Joseph M. Cataldo, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Hyman and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for criminal sexual assault because defendant cannot show prejudice from trial counsel's failure to object to outcry evidence.

¶ 2    Following a bench trial, defendant Daniel A. Valenzuela was found guilty of six counts of criminal sexual assault of a family member under 18 years old and sentenced to a total of 28 years in prison. On appeal, defendant argues that trial counsel was ineffective for failing to object to outcry evidence as inadmissible hearsay. We affirm.

¶ 3                                I. BACKGROUND

¶ 4      Defendant was charged by indictment with multiple offenses stemming from incidents in March 2020. The charges stated that defendant was stepfather to M.B. and C.B., both under 18 years old at the time of the alleged conduct. The State proceeded on charges of aggravated criminal sexual assault causing bodily harm to M.B. (count II) and C.B. (counts V and VI) (720 ILCS 5/11-1.30(a) (West 2020)), six counts of criminal sexual assault of M.B. (counts VII and VIII) and C.B. (counts XIII-XVI ) (720 ILCS 5/11-1.20(a) (West 2020)), and one count of aggravated criminal sexual abuse for touching M.B.'s breasts (count XXI) (720 ILCS 5/11-1.60(b) (West 2020)).

¶ 5      Defendant is deaf, and the trial proceeded with the assistance of American Sign Language interpreters.

¶ 6      M.B. testified that she was 17 years old at the time of trial. In March 2020, she was 15 years old and lived with defendant, whom she identified in court, along with his two biological children, her mother, and her two siblings, including her sister C.B. M.B. shared a bedroom with C.B. and her stepsiblings. She had known defendant since 2014, and they generally got along, but there were small arguments. Defendant and M.B. communicated through sign language.

¶ 7      On March 19, 2020, M.B.'s mother left for work at around 9:30 p.m. and M.B. remained at home with defendant, her siblings, and stepsiblings. While M.B. and defendant were watching television on the couch, he asked to show her something. She responded, "no, it's fine," but eventually followed him into his bedroom and sat on the bed. Defendant went to the bathroom and returned holding a gel she recognized from the bathroom drawers. Defendant locked the bedroom door and knelt in front of M.B. He motioned for her to get on the floor, and she lay on her back on the floor near him. Defendant then removed her pants and underwear, put the gel on his fingers,

and inserted them into M.B.'s vagina. Defendant also lifted her shirt and kissed her neck and upper chest area. He placed his mouth on her vagina, inserted his fingers again, and used his mouth again. Afterward, he cleaned his face with baby wipes. He asked M.B. if she liked it. M.B. "didn't say no" and "shrugged it off." She testified that she was afraid of his reaction or what he would say if she said no, and she did not want to say yes. Defendant then told her to go to the bathroom and clean herself. When M.B. returned to her bedroom around 12:30 a.m., she lay on her bed and cried. C.B. asked her "if he did it to [you] too." M.B. replied, "yes." She did not recall whether there was any further discussion at that time.

¶ 8    On March 20, 2020, the Department of Children and Family Services (DCFS) called the home. Afterwards, defendant had two conversations with M.B. and C.B. During the first conversation, defendant apologized and wanted them to "cover for him and not say anything." Defendant told them that if anything happened to him, it would affect their mother's green card status to live legally in the United States. The second conversation occurred on the morning of March 24 or 25, 2020. Defendant apologized to M.B. and C.B., was "more emotional," said he would never do it again, and offered to buy them clothes or "whatever [they] wanted, anything [they] needed." He told them again that their mother could lose her green card status if anything happened to him. M.B. worried for her mother.

¶ 9    On cross-examination, M.B. testified that nothing of a sexual nature had previously occurred with defendant. She thought about yelling during the incident because the other children were home but she "felt frozen" and did not want to do anything that would make defendant react a certain way.

¶ 10    M.B. testified that the only conversation with a DCFS investigator she could recall occurred on March 25, 2020. She could not remember with whom she conversed but told someone from DCFS that defendant never physically abused or molested her or her siblings. Besides the conversation with C.B. during the early morning hours of March 20, 2020, the only other person that M.B. told about the abuse was her friend from school, Lhaye.

¶ 11    On redirect examination, M.B. testified that she did not tell her mother about what happened on March 20, 2020, because defendant threatened that her mother's green card would be revoked, and her mother would be deported. M.B. was afraid she would be homeless. She explained that her fear was the reason she initially did not tell DCFS about what happened.

¶ 12    C.B. testified that she was 15 years old at the time of trial and was 13 years old in March 2020. She had known defendant, whom she identified in court, since around 2013, and had a normal relationship with him.

¶ 13    Around 12:30 a.m. on March 20, 2020, she was in bed and noted that M.B. was not in bed yet. She knew M.B. and defendant were in his bedroom with the door closed. When M.B. returned to their bedroom, she was crying. C.B. asked her if "he [did] this to you, too?" M.B. did not give a clear response and cried more.

¶ 14    C.B. testified that a week prior to the March 20 incident involving M.B., she had been getting ready for bed in the bathroom when defendant entered and asked her to sit on the toilet. He placed a towel under the door to ensure no one could enter because the bathroom door did not lock. Defendant then knelt in front of her. He removed some gel from the drawer, placed some of the gel on his fingers, and inserted a finger into her vagina. He also placed his mouth on her vagina.

She told him to stop, then "kind of froze," and did not know what to do. C.B. did not tell anyone what defendant did to her because he threatened that her mother's green card would be revoked.

¶ 15    A couple of days before that incident, C.B. and defendant were watching television in the living room. Defendant then went to the bathroom, changed into his pajamas, and sat next to C.B. on the couch where she was lying down. He slid his hand under the blanket she used to cover herself, moved it up her leg, and touched her vagina over her pajama pants. Defendant then removed her pants and underwear and made her stand with her pants around her ankles. He applied a gel from the bathroom to his fingers and inserted them into her vagina. C.B. said "no" and "stop," but he kept going. Defendant then placed his mouth on her vagina. She had not previously seen the gel he used. C.B. identified People's Exhibit No. 1 as the bottle of gel that defendant had used when he touched her. After defendant stopped touching C.B., he told her that he was doing this to "teach [her] for whenever [she] got a boyfriend."

¶ 16    C.B. testified that a DCFS investigation occurred in 2019 when she was 12 years old. Over counsel's objection, C.B. stated that the investigation had commenced because defendant showed her pornography and touched her vagina over her clothing. She had told her mother about that incident. C.B. spoke with DCFS during the investigation and denied the allegations because she was afraid that her mother's green card would be revoked based on what defendant said.

¶ 17    C.B. testified that on March 19, 2020, she told M.B. about the incidents, and later texted her friend Megan about the incidents. C.B. did not tell her mother because she was afraid that it would affect her mother's green card. After DCFS called their home on March 20, 2020, defendant apologized to C.B. and M.B., said he would not do it again, and told them not to tell DCFS what happened because of their mother's green card. C.B. did not recall having multiple conversations

with individuals from DCFS but admitted that she initially told them defendant had not sexually abused her, because she was scared about her mother's green card.

¶ 18    On cross-examination, C.B. confirmed that around the time of the incidents defendant and her mother had many arguments and it was a difficult time for the children. In 2020, when these things were happening, C.B. and M.B.'s biological father was homeless, and they wanted him to live in the house.

¶ 19    C.B. recalled speaking with a DCFS investigator on March 21, 2020, who asked her how her friend knew her "affairs." C.B. did not know how her friend knew, because C.B. "lied and that was when [she] said *** nothing happened." She confirmed that she denied the 2019 and 2020 allegations to DCFS investigators. She continued denying everything until an investigator told her that she would have to undergo a medical exam.

¶ 20    On redirect examination, C.B. testified that she thought she would be homeless if something happened to her mother because her father was homeless at the time. She eventually told the truth when the DCFS investigator indicated it was safe to do so. The DCFS investigator did not pressure or threaten her to tell the truth. The investigator referenced text messages that C.B. sent to her friend. On re-cross examination, C.B. testified that she did not feel threatened when the investigator told her she would need a medical exam.

¶ 21    Cook County sheriff detective Leslie Pratts testified that on March 25, 2020, she accompanied a DCFS investigator to defendant's home. While there, the children told the investigator they did not feel safe and had been sexually assaulted. Defendant was arrested. The children were transported to the Children's Advocacy Center for a forensic interview. During the forensic interview, Pratts learned that C.B. had sent text messages to a friend, and that the friend

contacted a school staff member, who then contacted DCFS. Pratts later returned to the home where she retrieved and inventoried the gel that defendant used during the sexual assaults.

¶ 22    People's Exhibit No. 1, the gel lubricant, was admitted into evidence without objection. Defendant objected to the admission of People's Exhibit No. 2, the text messages from C.B. to her friend, citing a lack of foundation, and the court did not admit them into evidence.

¶ 23    Defendant moved for a directed finding on all counts, arguing that the case was based entirely on the testimony of M.B. and C.B., who were not credible. Specifically, counsel argued that C.B. testified that she had lied twice about the allegations, and M.B. testified incredibly that she did not recall any prior DCFS contact involving her or her sister.

¶ 24    The court stated that it considered only the relevant evidence and recounted the testimony of M.B. and C.B. The court observed their manner and demeanor and found them credible. The court further determined that their explanations for their initial stories were reasonable. The court granted the motion as to the counts alleging bodily harm (counts II, V, and VI) and that defendant touched M.B.'s breast (count XXI) and denied the motion for the remaining six counts alleging criminal sexual assault (counts VII, VIII, and XIII through XVI).

¶ 25    For the defense, DCFS investigator Austin Altman testified that he met with C.B. on March 25, 2020, and she initially denied any sexual abuse by defendant. When Altman referenced the text messages that C.B. had sent to her friend, C.B. initially denied sending any messages, and later said that she lied in the messages. C.B. admitted to the abuse after Altman told her she would need to undergo a medical exam.

¶ 26    On cross-examination, Altman testified that C.B. began crying when he told her he did not believe her denials, and when he asked her again, she admitted that the allegations against

defendant were true. C.B. said she denied the allegations because she was worried about her mother's immigration status. On redirect examination, Altman confirmed that C.B. cried when he informed her that she would need to undergo a medical examination.

¶ 27 The parties stipulated that Arturo Heredia, a former DCFS investigator, would have testified that he interviewed C.B. on March 21, 2020, and she "strongly denied" the allegations and denied sending a text message to her friend. He would also testify that C.B. stated she previously attended a forensic interview where she said, "he didn't do anything to me," and she told the truth that "nobody molested her at all." He also interviewed M.B., who denied any abuse by defendant towards herself or her siblings.

¶ 28 During closing arguments, the State noted that C.B. and M.B. "leaned on each other" and C.B. "leaned on a friend." Counsel challenged C.B.'s and M.B.'s credibility, noting that "[y]ou didn't hear from Megan, [C.B.'s] friend that she allegedly spoke to. You didn't hear from [M.B.'s] friend that she allegedly spoke to." Counsel argued that "it's the word of two girls who do have a motivation" and they "have to stick with their story."

¶ 29 The court found defendant guilty of the six counts of criminal sexual assault of a family member under age 18. The court remarked that "the case comes down to the testimony of the two complaining witnesses," and it could judge their manner and demeanor when testifying, judge the credibility and reasonableness of their testimony, and observe their emotion. The court found M.B. and C.B. credible. The court noted that they explained how defendant apologized to them, told them it would not happen again, and told them their mother's green card would be affected if they told anyone. The court stated that M.B. did not "embellish or fabricate." Rather, M.B. testified about her thought process when defendant asked her if she liked it, which was "very real and telling

testimony," and her testimony that defendant "told her he was preparing her" was "not something that a child would fabricate." M.B. "immediately told her sister [what happened] when her sister heard her crying that same night." The court similarly noted that C.B. testified that defendant told her he was "doing this to teach her [for] when she had a boyfriend," which was "not something a young person would fabricate." The court found that M.B. and C.B. had given credible reasons for lying to DCFS initially. Additionally, the court found that defendant's threats to their mother's green card were a "proper explanation" for M.B.'s and C.B.'s failure to be truthful initially.

¶ 30    Defendant filed a motion for new trial, arguing, in part, that the trial evidence referenced "possible text messages that were maybe given to [an] outcry witness," but "[t]hat outcry witness was not present in court, [and] did not provide any testimony." The court denied the motion, stating that it "did not consider any hearsay about outcry statements" and just considered "the relevant evidence."

¶ 31    Defendant was sentenced to 6 years in prison on each of the two counts of criminal sexual assault against M.B., and 4 years in prison on each of the four counts of criminal sexual assault against C.B., to be served consecutively, totaling 28 years in prison. The record does not reflect that defendant filed a motion to reconsider sentence.

¶ 32                            II. ANALYIS

¶ 33    On appeal, defendant argues that trial counsel was ineffective for failing to challenge the State's repeated elicitation of M.B.'s and C.B.'s outcry statements to one another and to their friends. Specifically, defendant cites (1) M.B.'s and C.B.'s testimony about their statements to one another on March 20, 2020; (2) C.B.'s testimony on direct examination regarding her text messages to her friend Megan; and (3) M.B.'s testimony on cross-examination regarding her

statement to her friend Lhaye. According to defendant, that testimony was inadmissible hearsay, which bolstered M.B.'s and C.B.'s testimony where the State's evidence rested entirely on their credibility.

¶ 34    A defendant in a criminal proceeding has a constitutional right to the effective assistance of counsel. *People v. Lewis*, 2022 IL 126705, ¶ 44. A criminal defendant's ineffective assistance of counsel claim is evaluated under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Cross*, 2022 IL 127907, ¶ 19. To prove a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defendant. *Id.* A defendant must satisfy both prongs to prevail on an ineffective assistance of counsel claim. *People v. Pingelton*, 2022 IL 127680, ¶ 53. If a defendant fails to establish prejudice, this court need not consider whether counsel's conduct was deficient. *People v. Garcia*, 2023 IL App (1st) 172005, ¶ 55. In this case, because the prejudice prong is dispositive, we proceed directly to that prong. *People v. Eubanks*, 2021 IL 126271, ¶ 31.

¶ 35    Under the prejudice prong, the defendant bears the burden of showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lewis*, 2022 IL 126705, ¶ 46. A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id.* "Where, as here, a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent counsel's errors, the factfinder would have had a reasonable doubt respecting guilt." *People v. Johnson*, 2021 IL 126291, ¶ 54. Under *Strickland*, a defendant must "'affirmatively prove' that prejudice resulted from counsel's errors." *Strickland*, 466 U.S. 668; *Lewis*, 2022 IL 126705, ¶ 46.

¶ 36    "[P]rejudice may be found even when the chance that minimally competent counsel would have won an acquittal is significantly less than 50 percent, as long as a verdict of not guilty would be reasonable." (Internal quotation marks omitted.) *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008). The reviewing court must consider the totality of the evidence and examine the ramifications that the improper evidence may have had on the lower court's understanding of the events. *Id.* We review claims of ineffective assistance *de novo*. *Lewis*, 2022 IL 126705, ¶ 48.

¶ 37    "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Unless hearsay falls within an exception to the rule, "this type of evidence is generally inadmissible due to its lack of reliability and the inability of the opposing party to confront the declarant." (Internal quotation marks omitted.) *People v. Williams*, 2023 IL App (1st) 192463, ¶ 94; see also Ill. R. Evid. 802 (eff. Jan. 1, 2011).

¶ 38    The State posits that the statements at issue were not offered for the truth of the matter asserted, or, alternatively, were admissible under the hearsay exceptions for a declarant's state of mind and excited utterances. See Ill. R. Evid. 803(2), (3) (eff. Mar. 24, 2022). Irrespective of whether the statements were inadmissible hearsay, however, defendant cannot demonstrate prejudice from trial counsel's failure to object because the omission of the challenged testimony would not have resulted in a different outcome at trial.

¶ 39    Although the court remarked that the case against defendant came down to the testimony of C.B. and M.B., the record shows that the trial court's assessment of C.B.'s and M.B.'s credibility was attenuated from any outcry statements, focusing instead on the manner, demeanor, and reasonableness of their testimony. The court only briefly mentioned the outcry testimony, noting

that M.B. "immediately told her sister [what happened] when her sister heard her crying that same night," and did not reference C.B's text messages to her friend, which were not entered into evidence. Moreover, in denying defendant's posttrial motion, the court expressly stated that it did not consider any hearsay statement. See *People v. Jenk*, 2016 IL App (1st) 143177, ¶ 53 (stating it is presumed that the trial court only considered admissible evidence). Thus, although hearsay evidence that is admitted without an objection "is to be considered and given its natural and probative effect" (*People v. Banks*, 378 Ill. App. 3d 856, 861 (2007)), in this case, the trial court's comments expressly reflect that it did not consider or did not heavily weigh the statements at issue.

¶ 40 Further, defendant cannot establish prejudice from counsel's failure to object to the challenged outcry testimony in light of the other evidence establishing his guilt of criminal sexual assault. Here, the State presented the testimony of C.B. and M.B., who recounted in detail defendant's sexual assaults, including defendant obtaining a gel from the bathroom and putting it on his finger to perpetuate the sexual assaults. The trial court, as noted, found C.B. and M.B. credible based on its assessment of their demeanor, manner, and emotion while testifying, and the reasonableness of their testimony. The court cited their testimony regarding defendant's apology, his statement that it would not happen again, his threats to their mother's green card, and his explanation of teaching them for their future boyfriends, which the court deemed was "not something a young person would fabricate." The court also deemed that defendant's threats to their mother's green card explained their initial failure to be truthful about defendant's sexual assault. C.B.'s and M.B.'s testimonies detailing defendant's sexual assault were compelling to the trial court and there is no reasonable probability that the court could have reached a different outcome had counsel objected to the challenged testimony. See *People v. Tucker*, 2022 IL App

(1st) 172982, ¶¶ 70-76 (stating a defendant is not prejudiced by deficient performance where the trial evidence was overwhelming).

¶ 41    Here, given the evidence against defendant that detailed the context and nature of the sexual assaults, and the trial court's detailed explanation of what evidence it did and did not consider, defendant has not established a reasonable probability that, had counsel objected to the admission of the challenged testimony, the outcome of the trial would have been different. See *McCarter*, 385 Ill. App. 3d at 935. As a result, defendant's ineffective assistance of counsel claim fails under the second prong of the *Strickland* standard. See *People v. Gaines*, 2020 IL 125165, ¶ 61. Because defendant cannot establish prejudice, we need not address whether counsel's performance was deficient. *People v. Hale*, 2013 IL 113140, ¶ 17. Accordingly, defendant's claim of ineffective assistance of counsel fails. *Gaines*, 2020 IL 125165, ¶ 61.

¶ 42                                III. CONCLUSION

¶ 43    For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 44    Affirmed.